**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK,

                Plaintiff,

      v.

UNITED STATES DEPARTMENT
OF LABOR, et al.,

                Defendants.

20-CV-3020 (JPO)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT, AND
REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

STANDARD OF REVIEW ...................................................................................... 2

ARGUMENT ......................................................................................................... 2

I.    New York has standing to challenge the Final Rule. ...................................... 2

      A.    New York will suffer concrete injuries-in-fact. ................................... 3

            1.    New York has standing based on its *parens patriae* interests. .................... 3

            2.    The Final Rule will increase health care costs paid by the State. ............... 7

            3.    The Final Rule will inflict administrative costs on New York. ................. 10

            4.    The Final Rule will cause New York to lose tax revenue. ......................... 11

      B.    New York's injuries are caused by the Final Rule and will be redressed by
            its invalidation. ..................................................................................... 13

II.   The challenged provisions of the Final Rule violate the APA. ........................ 14

      A.    The work availability restrictions conflict with the FFCRA. ............... 14

      B.    The Final Rule's definition of "health care provider" violates the FFCRA. ......... 18

      C.    The intermittent leave restrictions are not authorized by the statute. ................ 20

      D.    The Final Rule's documentation requirements exceed the agency's
            authority. ............................................................................................... 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*14 Penn Plaza LLC v. Pyett*,
556 U.S. 247 (2009)....................................................................................................6

*Adams v. Director, OWCP*,
886 F.2d 818 (6th Cir. 1989) ...................................................................................17

*Air Alliance Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ...............................................................................10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982)................................................................................................3-4

*Atl. Cleaners & Dyers, Inc. v. United States*,
286 U.S. 427 (1932)..................................................................................................20

*Aziz v. Trump*,
231 F. Supp. 3d 23 (E.D. Va. 2017) ..........................................................................7

*Barber v. Thomas*,
560 U.S. 474 (2010)..................................................................................................19

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..................................................................................................21

*Burrage v. United States*,
571 U.S. 204 (2014).............................................................................................16-18

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .....................................................................................9

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016)..........................................................................................2

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................................................................................................11

*City of N.Y. v. Heckler*,
742 F.2d 729 (2d Cir. 1984)........................................................................................6

*City of N.Y. v. Heckler*,
578 F. Supp. 1109 (E.D.N.Y. 1984) ...........................................................................6

ii

*Comm. to Stop Airport Expansion v. FAA*,
    320 F.3d 285 (2d Cir. 2003)..................................................................................25

*Connecticut v. U.S. Dep't of Commerce*,
    204 F.3d 413 (2d Cir. 2000)....................................................................................6

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................................... 3, 13-14

*Dep't of Homeland Sec. v. MacLean*,
    135 S. Ct. 913 (2015)..............................................................................................25

*District of Columbia v. U.S. Dep't of Agric.*,
    No. 20-cv-119, 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ...................................9

*Engine Mfrs. Ass'n v. EPA*,
    88 F.3d 1075 (D.C. Cir. 1996) ..............................................................................22

*Environmental Defense Fund v. Duke Energy*,
    549 U.S. 561 (2007)...............................................................................................20

*Grunley Walsh Int'l, LLC v United States*,
    78 Fed. Cl. 35 (Fed. Cl. 2007) ..............................................................................22

*Huntington Hosp. v. Thompson*,
    319 F.3d 74 (2d Cir. 2003).....................................................................................19

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
    92 F.3d 1248 (D.C. Cir. 1996)...............................................................................16

*Iowa v. Block*,
    771 F.2d 347 (8th Cir. 1985) .................................................................................13

*Jones v. Coughlin*,
    45 F.3d 677 (2d Cir. 1995)......................................................................................5

*King v. Burwell*,
    135 S. Ct. 2480 (2015)....................................................................................15, 23

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002).....................................................................................3

*Leonard F. v. Israel Discount Bank of N.Y.*,
    199 F.3d 99 (2d Cir. 1999).....................................................................................19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................................................................2

*Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) ........................................................................ 6-7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................................... 3-5

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ............................................................................................4

*Michigan v. EPA*,
    581 F.3d 524 (7th Cir. 2009) ..............................................................................7

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ..........................................................................14

*Nevada v. Burford*,
    918 F.2d 854 (9th Cir. 1990) ..............................................................................6

*New York v. Mnuchin*,
    408 F. Supp. 3d 399 (S.D.N.Y. 2019) ......................................................... 3-4, 11

*New York v. Schweiker*,
    557 F. Supp. 354 (S.D.N.Y. 1983) ....................................................................6

*New York v. Sebelius*,
    No. 07-cv-1003 (GLS), 2009 WL 1834599 (N.D.N.Y. June 22, 2009) ...................6

*New York v. U.S. Dep't of Agric.*,
    No. 19-cv-2956 (ALC), 2020 WL 1904009 (S.D.N.Y. Apr. 16, 2020)..............7, 10

*New York v. U.S. Dep't of Health & Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019)......................................................2, 21, 24

*New York v. U.S. Dep't of Homeland Sec.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019)..............................................................8, 10

*New York v. U.S. Dep't of Labor*,
    363 F. Supp. 3d 109 (D.D.C. 2019) ........................................................ 9, 11-13

*New York v. United States*,
    65 F. Supp. 856 (N.D.N.Y. 1946) ......................................................................6

*NRDC v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ............................................................................7

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013).................................................................................3

*NRDC v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018)....................................................................14

*NRDC v. U.S. Dep't of the Interior*,
    397 F. Supp. 3d 430 (S.D.N.Y. 2019).............................................. 13-14

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ............................................................13

*Pennsylvania v. President*,
    930 F.3d 543 (3d Cir. 2019)..................................................................9

*Pereira v. Sessions*,
    138 S. Ct. 2105 (2018)........................................................................22

*Pyett v. Pennsylvania Bldg. Co.*,
    498 F.3d 88 (2d Cir. 2007)....................................................................6

*Ross v. AXA Equitable Life Ins. Co.*,
    115 F. Supp. 3d 424 (S.D.N.Y. 2015)..................................................11

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................14

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..........................................................................3

*State ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ..............................................................7

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..............................................................................3

*U.S. Dep't of Defense v. FLRA*,
    982 F.2d 577 (D.C. Cir. 1993) ............................................................21

*Util. Air Regulatory Grp. v. E.P.A.*,
    573 U.S. 302 (2014)............................................................................16

*Virginia v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ................................................................7

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)............................................................................11

**FEDERAL STATUTES**

29 U.S.C.
 § 2611 ............................................................................................................................19
 § 2612(a)(1) ....................................................................................................................17
 § 2612(b) .........................................................................................................................23
 § 2613 .............................................................................................................................25

Families First Coronavirus Response Act
 § 3102(b) ................................................................................... 15, 18, 22-23, 25
 § 5102(a) ....................................................................................... 15-17, 21
 § 5110(5)(E) ................................................................................. 15-17, 21
 § 5111(1) .........................................................................................................................18

Family and Medical Leave Act
 § 110(a)(1)(B) ..............................................................................................................15
 § 110(a)(1)(F) ............................................................................................................15, 22
 § 110(a)(3)(A) ..............................................................................................................18
 § 110(b)(1) ......................................................................................................... 22-23
 § 110(b)(2)(A) ..............................................................................................................23
 § 110(c) ...........................................................................................................................25
 § 110(d) ...........................................................................................................................15

**STATE STATUTES**

N.Y. Tax Law
 § 612(a) ..........................................................................................................................11

**FEDERAL REGULATIONS**

29 C.F.R.
 § 825.112(a) ..................................................................................................................17
 § 825.200(h) ..................................................................................................................20

*Paid Leave Under the Families First Coronavirus Response Act*, 85 Fed. Reg.
 19,326 (Apr. 6, 2020) ................................................................................... passim

*Establishing Paid Sick Leave for Federal Contractors*, 81 Fed. Reg. 67,598 (Sept.
 30, 2016) ................................................................................................... 9-10, 12

*The Family & Medical Leave Act of 1993*, 60 Fed. Reg. 2180 (Jan. 6, 1995)......................... 17-18

**RULES**

Fed. R. Civ. P. 12(b)(1).................................................................................................2

Fed. R. Civ. P. 56(e)(1).................................................................................................2

**MISCELLANEOUS AUTHORITIES**

Final Brief for the Petitioners in Consolidated Cases, *Massachusetts v. EPA*,
    No. 03-1361, 2005 WL 257460 (D.C. Cir. filed Jan. 24, 2005) ................................................7

## INTRODUCTION

New York is the epicenter of a crisis facing the entire nation.  Our economy has been hit hard—by business closures, reduced work hours, and skyrocketing unemployment.  Our families have been hit hard—school and day care center closures mean parents need to be home to care for their children.  Our health care system has been hit harder still—we are building makeshift hospitals and moving heaven and earth to obtain necessary equipment.  To reduce these burdens and save lives, the mantra from state and federal officials alike has been: "stay home"—because that is the only effective means to slow the spread of disease.  Congress passed the Families First Coronavirus Response Act to help New Yorkers and the rest of the country do that.  The law guarantees paid leave and finances it through billions in federal tax dollars so workers can care for their children, their families, and themselves without suffering even more economic pain.

New York filed this lawsuit because the Department of Labor's regulation implementing this first-of-its-kind federal law leaves gaping, nonsensical, and unlawful loopholes in the availability of necessary paid leave.  New York has standing to bring this action because the complaint alleges, and the summary judgment record shows, that New York will suffer concrete injuries because of the Final Rule's exclusions from paid leave—injuries Defendants themselves, in the Final Rule and otherwise, have in large measure conceded.  In opposing New York's summary judgment motion on the merits, Defendants have not satisfactorily explained their stark departure from the Act's commands.  Nothing suggests Congress only wanted an employee to be able to take paid leave if, on a particular day, work was available—a result in direct conflict with Defendants' purported insistence that an employee take leave in a continuous period.  Nothing indicates Congress permitted Defendants to adopt an expansive definition of health care provider to exempt millions from the Act's protections—instead, Congress instructed Defendants to use a much narrower, settled definition.  Defendants' response on intermittent leave is a rulemaking-

by-opposition-brief effort to trim the Rule's most egregious overreach, while still conflicting

with the statute and producing a series of absurd results.  And Defendants offer no meaningful

response to New York's argument that requiring documentation before taking leave is

impermissible under the Act and conflicts with its central goal of helping employees leave the

workplace *now*.  New York's motion for summary judgment should be granted.

## STANDARD OF REVIEW

Under Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the Court has

subject-matter jurisdiction.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff has

standing at the pleading stage if it plausibly alleges facts, accepted as true and construed in its

favor, showing that it has standing.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d

Cir. 2016).  To establish standing "[i]n response to a summary judgment motion," the plaintiff

"must 'set forth' by affidavit or other evidence 'specific facts' . . . which for purposes of the

summary judgment motion will be taken to be true."  *Carter*, 822 F.3d at 56.  If a factual

assertion is not adequately supported in response to a summary judgment motion, "the court may

give an opportunity to properly support or address the fact."  Fed. R. Civ. P. 56(e)(1).

In evaluating cross-motions for summary judgment on Plaintiff's APA claims, "[t]he

entire case on review is a question of law."  *New York v. U.S. Dep't of Health & Human Servs.*,

414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019).  Summary judgment "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the relevant APA standard of review."  *Id.*

## ARGUMENT

**I.      New York has standing to challenge the Final Rule.**

To show standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "States are

not normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special

solicitude" when evaluating standing. *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007); *see*

*also New York v. Mnuchin*, 408 F. Supp. 3d 399, 408 (S.D.N.Y. 2019).

### A.  New York will suffer concrete injuries-in-fact.

The Final Rule causes New York direct injury.  A plaintiff may show injury-in-fact by

showing either actual or imminent harm or a "concrete" risk of harm.  *Spokeo*, 136 S. Ct. at

1548; *see also NRDC v. FDA*, 710 F.3d 71, 82 (2d Cir. 2013) (requiring a "credible threat" of

harm).  Allegations of a "future injury" qualify "if the threatened injury is 'certainly impending,'

or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 158 (2014).  The injury "need not be large, an identifiable trifle will suffice."  *LaFleur*

*v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002).

Here, the "predictable effect[s]" of the Final Rule give New York standing.  *Dep't of*

*Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).  New York has established four injuries

traceable to the rule and redressable by the requested relief: (1) the Final Rule harms New York's

*parens patriae* interests in the health and well-being of its residents; (2) the State's health care

costs will be higher because the Final Rule puts New Yorkers at greater risk of adverse health

impacts and the State pays health care costs for some of those residents; (3) the Final Rule will

increase the administrative burden on State-operated programs; and (4) New York will lose tax

revenue as a result of the Final Rule.

### 1.  New York has standing based on its *parens patriae* interests.

To assert standing as *parens patriae*, a state must articulate "a quasi-sovereign interest in

the health and well-being" of its residents.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel.*

*Barez*, 458 U.S. 592, 607 (1982).  A state may invoke *parens patriae* interests in an action

against the federal government to enforce federal law. *Massachusetts*, 549 U.S. at 520 n.17. As this Court previously recognized, "an injury to a state's quasi-sovereign interests, such as its interest in the 'health and well-being—both physical and economic—of its residents in general,' may sometimes be sufficient to support the state's standing to sue 'on behalf of [its] citizens.'" *Mnuchin*, 408 F. Supp. 3d at 408 (quoting *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000), and *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir. 2002)).

Here, New York sues to enforce the FFCRA based on New York's *parens patriae* interests in "the health and well-being of adults and children who live in this State." Compl. ¶ 95. As demonstrated in Part I.A.2 below, New York has plausibly alleged—and the evidence accompanying this summary judgment opposition shows—that the Final Rule will have adverse health consequences for New Yorkers, or at least create a concrete risk of those consequences.

Defendants argue (Mem. 11-14) that New York may not invoke *parens patriae* interests to sue a federal agency even where the State sues to enforce federal law. Defendants rely on *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Snapp*, 458 U.S. at 610 n.16, but *Massachusetts v. EPA* rejected Defendants' reading of *Mellon*, and neither *Mellon* nor *Snapp* have been applied in this Circuit to bar *parens patriae* suits.

In *Mellon*, Massachusetts invoked its *parens patriae* interests to challenge the constitutionality of a federal statute. 262 U.S. at 479-80. The Supreme Court stated that "[i]t cannot be conceded that a State, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 485. In *Snapp*, a suit by Puerto Rico against private parties, the Court stated briefly in a footnote that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. at 610 n.16. Neither case involved a State seeking to *invoke* the protections of federal

4

law when a federal agency either declined to enforce, or took a cabined view of, that law.

The Supreme Court revisited the question in *Massachusetts v. EPA*, a suit by Massachusetts and others challenging EPA's refusal to regulate greenhouse gas emissions under the Clean Air Act. The Court held Massachusetts had standing as a landowner because rising sea levels would harm state coastal property. 549 U.S. at 522-23. The Court further explained in a footnote "the long development of cases permitting States 'to litigate as *parens patriae* to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole.'" *Id.* at 520-21 n.17 (quoting Hart & Wechsler's The Federal Courts & the Federal System 290 (5th ed. 2003)). The Court explained there was "a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* (*quoting Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945)).

Here, as in *Massachusetts v. EPA*, New York is not seeking to *evade* application of the FFCRA to its citizens or to "protect" its citizens "from the operation of" that law, *id.*; rather, New York seeks to assert its rights under that statute to protect the State's residents. The Second Circuit has long permitted New York to sue as *parens patriae* to enforce a federal law against a federal agency. In *Carey v. Klutznick*, the Second Circuit held that "the State of New York has standing in its capacity as *parens patriae*" to sue the Commerce Department on a claim that the conduct of the 1980 decennial census unlawfully undercounted New York residents. 637 F.3d 834, 838 (2d Cir. 1980). Defendants argue in a footnote that *Carey* was "mistaken" (Mem. 12 n.8), but only the Second Circuit sitting *en banc* may invalidate *Carey*'s holding. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995). Defendants' footnote (Mem. 12 n.8) stating that *Carey*'s holding was "arguably dictum" because the Court "had already found that New York

had standing based on direct injuries to the state" is wrong: "[a]n alternative conclusion in an

earlier case that is directly relevant to a later case is not *dicta*; it is an entirely appropriate basis

for a holding in the later case." *Pyett v. Pennsylvania Bldg. Co.*, 498 F.3d 88, 92-93 (2d Cir.

2007), *rev'd on other grounds sub nom. 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009).[1]

Courts in this Circuit have routinely held that New York may sue in its *parens patriae*

capacity to enforce a federal law against a federal agency.  Most recently, in *Vullo v. Office of

the Comptroller of the Currency*, the district court noted that "without implicating the concerns

in *Mellon*, states possess standing to 'prevent[] an administrative agency from violating a federal

statute' in order to 'vindicate the [c]ongressional will.'"  378 F. Supp. 3d 271, 284, 287

(S.D.N.Y. 2019) (quoting *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984)).[2]

In opposing *parens patriae* standing, Defendants rely exclusively on out-of-Circuit

precedent.  *See* Defs.' Mem. 12-13.  With the exception of the D.C. Circuit's recent decision in

*Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019), none of Defendants' cited cases is

applicable here.  For example, *Nevada v. Burford*, 918 F.2d 854 (9th Cir. 1990), predated

*Massachusetts v. EPA*—and Defendants fail to note subsequent Ninth Circuit caselaw

concluding states are *not* "barred from litigating as *parens patriae* to enforce a federal statute

---

[1] Defendants' assertion that the Second Circuit has retreated from *Carey* (Mem. 12 n.8) is also wrong. The case Defendants cite says no such thing. *Connecticut v. U.S. Dep't of Commerce*, 204 F.3d 413, 415 n.2 (2d Cir. 2000) (noting that Connecticut's standing based on "lost revenue" rendered it unnecessary to "consider whether it would also have standing as *parens patriae*").

[2] *See also New York v. Sebelius*, No. 07-cv-1003 (GLS), 2009 WL 1834599, at *12 (N.D.N.Y. June 22, 2009) ("[A] *parens patriae* claim seeking to compel federal compliance with federal law is permissible where a State's independent quasi-sovereign interest is implicated."); *City of N.Y. v. Heckler*, 578 F. Supp. 1109, 1122-23 (E.D.N.Y. 1984) (New York had *parens patriae* standing), *aff'd on other grounds*, 742 F.2d 729 (2d Cir. 1984); *New York v. Schweiker*, 557 F. Supp. 354, 358, 362 (S.D.N.Y. 1983) (same); *New York v. United States*, 65 F. Supp. 856, 872 (N.D.N.Y. 1946) (same), *aff'd*, 67 S. Ct. 1207 (1947).

against the federal government."[3]  *NRDC v. EPA*, 542 F.3d 1235, 1249 n.8 (9th Cir. 2008).

The D.C. Circuit's recent decision in *Manitoba* does not square with *Massachusetts* or binding Second Circuit precedent.  The *Manitoba* court concluded that the "the Supreme Court had no need to carve out an exception to the *Mellon* bar in *Massachusetts v. EPA* because Massachusetts did not sue in its *parens patriae* capacity," and instead "sued to remedy its own injury [as a landowner] rather than that of its citizens."  *Manitoba*, 923 F.3d at 182.  But the *Massachusetts* record does not support that characterization: in addition to harms as property owners, the state petitioners alleged that they "have been, and will continue to be, injured in a variety of ways" through "demonstrated harms" that included not just injuries as landowners, but also "increased health effects" and "increased health care related costs."  *See* Final Brief for the Petitioners in Consolidated Cases at 2-3, *Massachusetts v. EPA*, No. 03-1361, 2005 WL 257460, at *2-3 (D.C. Cir. filed Jan. 24, 2005).  Regardless, until the Second Circuit holds otherwise, *Carey* controls.  New York may invoke *parens patriae* standing based on the State's quasi-sovereign interests in the health and well-being of its residents.

### 2.   The Final Rule will increase health care costs paid by the State.

New York has standing based on the likely increase in uncompensated health care costs. Compl. ¶¶ 95-107.  A state has standing to challenge federal action that increases health care costs paid by the state.  *New York v. U.S. Dep't of Agric.*, No. 19-cv-2956 (ALC), 2020 WL

---

[3] *State ex rel. Sullivan v. Lujan*, 969 F.2d 877 (10th Cir. 1992), likewise preceded *Massachusetts v. EPA*.  In *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009), Michigan attempted to *prevent* the Clean Air Act's requirements from being applied to emitting sources within that state, and the court held that Michigan had no quasi-sovereign interest at stake because its air "could only benefit" from the EPA action it was challenging.  And *Virginia v. Sebelius*, 656 F.3d 253 (4th Cir. 2011), did not discuss *Massachusetts v. EPA* at all, *see* 656 F.3d at 269, and subsequent in-circuit authority refutes Defendants' characterization of Fourth Circuit law.  *Aziz v. Trump*, 231 F. Supp. 3d 23, 30-32 (E.D. Va. 2017).

1904009, at *5-9 (S.D.N.Y. Apr. 16, 2020); *New York v. U.S. Dep't of Homeland Sec.*, 408 F.

Supp. 3d 334, 343-44 (S.D.N.Y. 2019), *preliminary injunction stayed pending appeal*, 140 S. Ct.

599 (2020).  Defendants' response is that New York has not shown "just how and to what extent

the challenged aspects of the Rule will impact its healthcare costs."  Defs.' Mem. 16.  But the

record amply supports standing for both pleading and summary judgment purposes.

      First, the complaint adequately alleges that the Final Rule's challenged provisions will

exclude more New Yorkers from eligibility for paid leave, which will cause more New York

residents to become infected with the coronavirus.  Compl. ¶¶ 95-100.  The summary judgment

record substantiates the point.  *See* Ku Decl. ¶¶ 10-17 (Ex. 2); Boushey Decl. ¶¶ 20-23 (Ex. 1);

Thorsfeldt Decl. ¶¶ 11-12 (Ex. 4).  Dr. Leighton Ku presented evidence that "[t]he lack of paid

leave increases the risk that workers will go to work even when they are ill in order to avoid the

loss of wages," and that "paid leave . . . reduces illness among other workers by preventing

infection."  Ku Decl. ¶¶ 12, 15 (Ex. 2); *see also* Boushey Decl. ¶¶ 21-22 (Ex. 1); Thorsfeldt Decl.

¶ 12 (Ex. 4).  Dr. Ku further testified that "[p]aid leave is particularly important in reducing

transmission of communicable diseases like Covid-19."  Ku Decl. ¶ 16 (Ex. 2).

      The Department admits as much.  The Final Rule finds that "the FFCRA provides for

paid sick leave and expanded family and medical leave so employees will not be forced to

choose between their paychecks and the individual and public health measures necessary to

combat COVID-19."  85 Fed. Reg. 19,326, 19,335 (Apr. 6, 2020). The *unavailability* of paid

leave thus *does* require employees either to forego pay or disregard "the individual and public

health measures necessary" to combat the disease.  *Id.*  In addition, the Final Rule concedes that

"injudicious" use of its expansive definition of "health care provider" will cause further spread of

the disease: "To minimize the spread of COVID-19, the Department encourages employers to be

judicious when using this definition to exempt health care providers and emergency responders from the provisions of the FFCRA."  85 Fed. Reg. at 19,334.  And the Department explicitly recognized in its 2016 rulemaking on paid leave for federal contractors that "multiple studies have shown that paid sick leave greatly reduces the chance of employee injury and/or exposure to illness."  *Establishing Paid Sick Leave for Federal Contractors*, 81 Fed. Reg. 67,598, 67,694-95 (Sept. 30, 2016); *see* Compl. ¶¶ 96-97, 100.  These findings alone suffice for injury-in-fact. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, No. 20-cv-119, 2020 WL 1236657, at *25 (D.D.C. Mar. 13, 2020) (finding standing where agency "has actually 'done much of the legwork'" in establishing harm) (quoting *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 224-25 (1st Cir. 2019)); *see also Pennsylvania v. President*, 930 F.3d 543, 562 (3d Cir. 2019); *California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018); *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 127 (D.D.C. 2019).

Second, the complaint plausibly alleges that the increased number of New Yorkers who become sick because of the Final Rule will increase the State's health care expenses.  Compl. ¶¶ 101-07.  Dr. Ku's analysis supports the point, showing that the increased likelihood of illness "creates a direct burden for the State of New York and to health care providers supported by the State of New York," in "at least two ways": through higher Medicaid costs and costs of care for uninsured patients by public hospitals.  Ku Decl. ¶¶ 18-26 (Ex. 2); *see also* Boushey Decl. ¶¶ 20-22 (Ex. 1); Thorsfeldt Decl. ¶¶ 4-8, 13 (Ex. 4).  Dr. Ku further estimates that the hospitalization costs for one uninsured patient will be between $13,000 and $40,000.  Ku Decl. ¶ 23 (Ex. 2).

The Department's own analysis makes this point too.  The assessment of costs and benefits that the Department prepared in connection with the Final Rule, *see* 85 Fed. Reg. at 19,342-46, concludes that "the benefits of the paid sick leave and emergency family and medical

leave provisions of the FFCRA are vast," including that "with the availability of paid leave, sick or potentially exposed workers will be encouraged to stay home, thereby helping to curb the spread of the virus and lessen the strain on hospitals and health care providers."  *Id.* at 19,345.  It follows that the *unavailability* of paid leave—through what New York argues is the Department's cramped application of the leave eligibility provisions—will *increase* spread of the virus and *increase* the strain on hospitals and health care providers.  Because New York operates hospitals and pays the cost of care for numerous patients, Compl. ¶¶ 101-07, Defendants' acknowledgment that decreasing the availability of paid leave will increase the strain on health care providers and hospitals because of the occurrence of more COVID-19 infections is a concession that New York is harmed.  *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018); *see also New York*, 2020 WL 1904009, at *7-9 (standing based on an increase in state health care costs); *New York*, 408 F. Supp. 3d at 343-44 (same).

### 3.    The Final Rule will inflict administrative costs on New York.

The Final Rule also injures New York by increasing the administrative burden on the State, including through increased reliance on programs like unemployment insurance.  The complaint plausibly alleges that the unavailability of paid leave under the FFCRA will lead to increased job separations, which will increase reliance on unemployment insurance programs administered by the State.  Compl. ¶¶ 108-10; *see* 81 Fed. Reg. at 67,695 (the Department's earlier analysis that "[p]roviding paid sick leave is associated with a decrease in the probability of job separation of 25 percent").  Evidence further establishes that the Final Rule's restrictions on paid leave will increase job separation and thus "increase the financial and administrative strains on New York state's public benefits programs," including unemployment insurance and the Supplemental Nutrition Assistance Program.  Boushey Decl. ¶¶ 13, 16-19, 23 (Ex. 1).

The Department's own analysis confirms these facts, finding that "[w]ithout this paid

10

sick leave and expanded family and medical leave . . . there could be long-term costs" that include "increased reliance on social assistance programs," 85 Fed. Reg. at 19,345, many of which are operated by the State. *See* Boushey Decl. ¶¶ 16-19 (Ex. 1). The Final Rule further says that an employee ineligible for leave because of the Final Rule's work availability restrictions "may be eligible for state unemployment insurance and should contact his State workforce agency or State unemployment insurance office." 85 Fed. Reg. at 19,329. This is again the kind of proprietary injury that confers standing. *New York*, 363 F. Supp. 3d at 126.

Defendants protest that absent evidence of "additional staff hiring" or similar, New York's claim of administrative burden is "merely incidental" to the challenged action. Defs.' Mem. 16-17. But where the allegations and evidence are confirmed by the agency's own assessment that this precise harm will follow, the threatened harm is "sufficiently real and immediate to show an existing controversy," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), and New York need not "demonstrate that it is literally certain that the harms they identify will come about." *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015); *see also New York*, 363 F. Supp. 3d at 127.

### 4.    The Final Rule will cause New York to lose tax revenue.

Finally, New York is injured because the State imposes and collects taxes on income, N.Y. Tax Law § 612(a), and a reduction in taxable income inflicts "a direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 447-48 (1992).

The complaint adequately alleges that FFCRA leave wages are taxable to the employee; that the denial of such wages under the Final Rule will reduce New York State tax revenue; and that the reduction in workers' available income will reduce sales tax collections as well. Compl. ¶¶ 111-13. As in *Mnuchin*, "[b]asic economic logic" supports New York's prediction that the Final Rule will reduce the State's tax intake. *Mnuchin*, 408 F. Supp. 3d at 410 (quoting *Am. Inst.*

*of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015)).

The summary judgment record further establishes that workers who lack access to paid leave are often forced to take unpaid time off, *see* Boushey Decl. ¶¶ 14, 17 (Ex. 1); and that "[d]enying an employee paid leave time that otherwise would be required by the FFCRA . . . would deny the employee any paid leave wages required to be paid by those provisions," thereby "reduc[ing] the employee's taxable income for New York State tax purposes."  Palladino Decl. ¶¶ 7-12 (Ex. 3); *see* Boushey Decl. ¶ 14 (Ex. 1).  This direct connection shows injury to the State.  *See New York*, 363 F. Supp. 3d at 125 ("[T]he States have met their burden to show a 'fairly direct link' between" the challenged rule and the loss of tax revenue, where the rule's "expansion of self-funded [Association Health Plans] will decrease state tax revenues because the affected States will not collect premium taxes when individuals select coverage through a self-insured [Plan]") (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).

Again, the Department's own findings confirm this harm and acknowledge that when faced with the denial of paid leave, some employees will forego their paychecks rather than jeopardize their safety or the public health.  *See* 85 Fed. Reg. at 19,335 ("[T]he FFCRA provides for paid sick leave and expanded family and medical leave so employees will not be forced to choose between their paychecks" and health measures); *id.* at 19,345 (benefits of "receiv[ing] pay while on leave" include being able "to continue to spend money to help support the economy," with "spillover effects . . . on their communities and the national economy as a whole"); *see also* 81 Fed. Reg. at 67,662 (noting that improper denial of paid sick leave can cause employees to take unpaid leave).  The legislative history confirms that Congress was concerned that absent a robust, federally-funded paid leave program, workers would be required to take unpaid leave and forego their paychecks.  *See* Compl. ¶¶ 51-55. Where the Department

has recognized—and the legislative history confirms—that paid leave is necessary to avoid depriving some employees of their wages, the Department should not now be heard to contend that there is no evidence that the Final Rule's *limits* on paid leave could *lower* workers' earnings.

Defendants assert New York cannot show standing based on claimed "diminution of general tax revenues."  Defs.' Mem. 16.  But the cases Defendants cite hold only that tax loss may not support state standing when that loss is "distantly related to the wrong for which relief is sought" and "largely an incidental result of the challenged action."  *Kleppe*, 533 F.2d at 672; *see Iowa v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (same).[4]  New York's claim is not "distantly related," but rather inextricably intertwined with, the challenged action. The FFCRA channels paid leave wages through an employer, to an employee, with the federal government picking up the tab through employer-side credits.  But the wages are taxable to the employee, so *denying* them (as the Final Rule would do in many instances) means *subtracting* them from the employee's taxable income.  Any required linkage is easily present here.

> **B.      New York's injuries are caused by the Final Rule and will be redressed by its invalidation.**

New York's injuries are traceable to the challenged provisions, and a favorable decision would redress these injuries.  *See, e.g.*, *New York*, 363 F. Supp. 3d at 127.  It is a "predictable effect of Government action on the decisions of third parties," *Dep't of Commerce*, 139 S. Ct. at 2566, that the Final Rule's exclusions from paid leave will likely cause employers to deny leave where the FFCRA would otherwise require it.  *See, e.g.*, *NRDC v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 440 (S.D.N.Y. 2019).  "Once [the defendant agency] promulgated the [action at

---

[4] *Kleppe* and *Block* were both suits to *compel* government action—to force an agency to release disaster funds.  *See Block*, 771 F.2d at 348; *Kleppe*, 533 F.2d at 670.  The harm to the States' general tax base came from natural disasters, not government action.  Here, the Final Rule itself restricts paid leave availability and will thereby likely reduce workers' taxable wages.

issue], it was a hardly-speculative exercise in naked capitalism to predict that facilities would take advantage of it."  *Id.* (quoting *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014)).

Defendants argue that New York's injuries are caused not by the Final Rule but by the coronavirus pandemic.  Defs.' Mem. 19.  But Defendants use the wrong baseline: "[t]he consequences of the agency's action must, for causation purposes, be assessed not by reference to the status quo ante but instead to other actions [the agency] could have taken."  *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014).

Defendants argue that New York's characterization of the rule's impact is "guesswork."  Defs.' Mem. 19.  But it is not speculative to conclude that the Final Rule will cause employers to exclude employees from paid leave eligibility, as the Final Rule itself allows.  *NRDC v. NHTSA*, 894 F.3d 95, 104-05 (2d Cir. 2018) (delaying penalty increase for automakers that violate fuel standards would lead automakers to violate those standards more frequently, and thus cause more pollution that would injure the plaintiffs); *see also NRDC*, 397 F. Supp. 3d at 440.  Indeed, the Final Rule says the purpose of these exclusions is that they be used, and projects that employers will make use of them. 85 Fed. Reg. at 19,329, 19,334-37, 19,339, 19,342-43.  This easily meets the traceability standard, which is "lower than proximate cause," *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013), and "requires no more than *de facto* causality."  *Dep't of Commerce*, 139 S. Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)).

## II.      The challenged provisions of the Final Rule violate the APA.

### A.      The work availability restrictions conflict with the FFCRA.

The Final Rule's restrictions on paid leave if the employer "does not have work" for the employee contravene the text and purpose of the FFCRA.  *See* Pl.'s Mem. 7-11.  The FFCRA unambiguously requires paid sick leave and emergency family leave if the employee has a "need for leave"; if the employee's need exists because of a qualifying reason; and if the employee is

unable to work "due to" that employee's "need."  FFCRA § 5102(a); *see id.* § 3102(b) (adding FMLA § 110(a)(1)(F)).  Congress included several express exclusions depending on an employer's circumstances.  *See, e.g.*, *id.* § 3102(b) (adding FMLA §§ 110(a)(1)(B) (exclusion of employers with 500 or more employees), (a)(3)(B) (exemption for small businesses).  Congress's inclusion of these express limitations, based on an employer's circumstances, implies Congress intended no others.[5]  That point holds especially true here: at issue is a watershed remedial statute meant to channel tens of billions of dollars into the economy *right now*.  Without saying so expressly, Congress would not have inserted a capacious and unpredictable loophole basing eligibility on the hour-by-hour or day-by-day happenstance that work may not be available.

The absurdity deepens when Defendants' work-availability limit encounters their intermittent-leave restriction.  Assume a single parent living in an area where schools are closed needs to take paid leave to care for her child—a circumstance probably faced today by millions around the country. EFMLEA leave is meant for just that reason.  Defendants tell her: you must take all of your leave in one continuous period, not intermittently; but then Defendants say, if your employer does not have work for you on a particular day, you are not eligible for paid leave because your qualifying reason is not the "but for" cause of your inability to work.  It is hard to imagine that Congress, in a provision designed to maintain employees' connection to their employers and channel billions of dollars into the economy *right now*, wanted to tie employees in unworkable knots like this.  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).

Defendants highlight statutory terms connoting a causal link between an employee's being unable to work for a series of reasons—contending that these terms connote only a "but

---

[5] Congress's provision of a limited restoration requirement, even when an employer is forced to eliminate an employee's position because of COVID-19, also strongly suggests Defendants' interpretation is wrong.  FFCRA § 3102(b) (adding FMLA § 110(d)).

for" causal relationship, and that an employee whose employer has no work for her can only be unable to work for *that reason* and not because of COVID-19.  Defs.' Mem. 22.  This argument does not withstand scrutiny.  First, Defendants selectively apply this causation principle—attempting in various ways to "mitigate the unreasonableness" of their construction by not applying it elsewhere.  *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014).  The most obvious example is that Defendants only apply their but-for principle to three of the six qualifying bases for EPSLA leave—even though the same statutory language applies to all six. *See* FFCRA § 5102(a) ("due to a need for leave because" of a series of reasons).  Defendants assert that "where the employer has no work for the employee, the employee would not be working regardless of whether he or she was also experiencing a qualifying reason."  Defs.' Mem. 22.  But Defendants have not applied that logic to three of the six bases for EPSLA leave. Selective interpretation of statutory text is a hallmark of unreasonable interpretation.  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996).

More generally, the Final Rule rests on internal contradictions.  Assume the same example as above: a single parent has a child subject to a school closure, and takes EFMLEA leave as a result.  During the ensuing ten weeks, there may very well be periods of time when, despite the school closure, she may be able to work—a relative may care for the child, daycare may open for limited hours.  During that time, the "but-for" causal link Defendants insist on—between the qualifying need for leave and the inability to work—would be broken.  Yet Defendants demand that she take the full ten weeks of leave in one "continuous period" absent her employer's agreement.  Defendants' positions on these points cannot easily be reconciled.

Defendants rely on *Burrage v. United States*, 571 U.S. 204 (2014), for the proposition

that the word "because" in EFMLEA indicates a "but for" causal relationship.  Defs.' Mem. 22.[6]

*Burrage* considered a criminal statute asking whether "death results from" the commission of the

offense.  571 U.S. at 206.  Relying on the principle that, "[w]here there is no textual or

contextual indication to the contrary," such language connoted but-for causality, *id.* at 212, the

Court held that "results from" meant "but for" causation.  Here, of course, text and context *do*

suggest otherwise.  Four of the five statutory triggers for FMLA *unpaid* leave that preceded the

enactment of FFCRA begin with "because," 29 U.S.C. § 2612(a)(1); and the Department's own

regulations employ the common-sense construction that employers "are required to grant leave to

eligible employees . . . *[f]or*" each of those reasons.  29 C.F.R. § 825.112(a) (emphasis added).

The Department itself has referred to those items as "the basic statutory circumstances for which

employers must grant FMLA leave."  *The Family & Medical Leave Act of 1993*, 60 Fed. Reg.

2180, 2189 (Jan. 6, 1995).  Nothing suggests that the presence of the word "because" before each

of those circumstances means that, if there is no work available on a particular day, an employer

may nonetheless deny FMLA leave—a result that presumably would shock any family taking

FMLA leave for the birth or adoption of a child (two examples of such leave).  *See, e.g.*, *id.* at

2190 (noting congressional intent to provide "'bonding' time" for adoptive parents in the home).

In any event, independently sufficient, concurrent causes are still covered even by the

causation principles discussed in *Burrage*.  571 U.S. at 214-15.  If an employee's inability to

work is caused by a qualifying reason under EFMLEA or EPSLA, another independent cause

---

[6] Defendants rest too much on the word "because" as discussed in *Burrage*.  In the FFCRA's
text, the word "because" links a qualifying reason only to the employee's "need for leave,"
asking in so many words whether the employee has a "need for leave" because of one of the
listed reasons.  FFCRA § 5102(a).  But whether an employee is "unable to work (or telework)
*due to* [that] need" is a different question, on which *Burrage* is not controlling.  Courts have
rejected agency contentions that the phrase "due to" requires but-for causation.  *See, e.g.*, *Adams
v. Director, OWCP*, 886 F.2d 818, 821 (6th Cir. 1989).

(such as an employer concluding no work is available that day) does not render the employee's qualifying circumstance meaningless from a causation perspective.  Rather, *both* are independently sufficient causes.  *Burrage*, 571 U.S. at 214-15.  Defendants' position would make all of the qualifying bases for leave superfluous if an employer concludes no work would be available for the employee—a condition never stated in the statute itself.

> **B.**     **The Final Rule's definition of "health care provider" violates the FFCRA.**

Congress clearly intended the longstanding FMLA definition of "health care provider" to apply to the FFCRA.  *See* Pl.'s Mem. 11 (explaining that the EFMLEA merely amended the FMLA, which already includes a definition of "health care provider," and the EPSLA expressly directs that the FMLA definition applies).  As discussed in Plaintiff's opening brief, Congress authorized the exclusion only of "certain *health care providers*," a phrase already defined by the FMLA, and defined consistently by regulation since shortly after the FMLA's enactment.  *See* FFCRA § 3102(b) (adding FMLA §§ 110(a)(3)(A)) (emphasis added); *see also* FFCRA § 5111(1) (same); 60 Fed. Reg. at 2268.  The FFCRA relies on that established law, and contains neither a new definition nor authorization to promulgate a separate, different definition. The Final Rule ignores the statute's clear mandate, and Defendants have no argument in response.

Instead, Defendants claim that because the FMLA previously authorized the Department to define "health care provider," the agency now has carte blanche to exempt millions of workers from the FFCRA's leave benefits.  Defendants do not contest that the Final Rule enables an employer to deny paid leave to an English professor, librarian, or cafeteria manager (by way of example), as these professions qualify as "health care providers" under the Department's novel definition.  Instead, Defendants note that the Department "encourages" the employer to "be judicious" in using its extremely broad definition.  Defs.' Mem. 29 (citing 85 Fed. Reg. at 19,334).  But if Congress had wanted employees to receive leave only where their employers

were feeling "judicious," it would have said so.  Instead Congress wrote that covered employers

"*shall provide*"—and employees "*shall be entitled*" to—leave.  Pl.'s Mem. 8-9.

The Final Rule also depends on interpreting a single defined term differently within the

same statute—a hallmark of unreasonable interpretation.  The Final Rule expressly contrasts its

*new* definition with the one that has long governed under the rest of the FMLA.  85 Fed. Reg. at

19,335.  So, even though all categories of leave provided by FMLA are governed by the

definitions in 29 U.S.C. § 2611, two definitions of "health care provider" now apply depending

on the type of leave.  A rule that "constru[es] the same act of Congress in a totally inconsistent

manner . . . cannot stand."  *Huntington Hosp. v. Thompson*, 319 F.3d 74, 75 (2d Cir. 2003)

(quoting *Babbitt*, 92 F.3d at 1260).

Defendants offer several responses, but none is persuasive.  Defendants say the

Department has authority to "carry out the purposes of the FFCRA's paid leave programs."

Defs.' Mem. 27.  Beyond this adage, though, Defendants point to no statement of legislative

purpose indicating Congress wanted employers to be able to exempt English professors or gift

shop employees from the statute's reach; and such a general statement, if one even existed,

would be insufficient to overcome the statute's clear command. *Leonard F. v. Israel Discount*

*Bank of N.Y.*, 199 F.3d 99, 105 (2d Cir. 1999).  Nor is there any factual basis or legislative

support for Defendants' unsupported contention that exempting such broad swaths of the

economy is necessary to "maintain[] a functioning health care system."  Defs.' Mem. 28.

Defendants next argue that, sometimes, context can displace the presumption that

identical words used in different parts of the same act mean the same thing.  *Id.* at 29-30.  This

principle has no application here.  *Barber v. Thomas*, 560 U.S. 474 (2010), involved a statute that

used the undefined phrase "term of imprisonment" in "different ways."  *Id.* at 484.  That is not

the case here.  Similarly, in *Environmental Defense Fund v. Duke Energy*, 549 U.S. 561 (2007),

the Court concluded that usages of the general term "modification" in two different programs

added to the Clean Air Act in the 1970s could convey different meaning depending on statutory

context, particularly where the cross-reference between the two was added only by a technical

amendment, *id.* at 565, 575-76.  But here, the term "health care provider" is not a general term

used in varying fashions in different statutory programs suggestive of different contextual

meaning.  There is no "variation in the connection in which the words are used as reasonably to

warrant the conclusion that they were employed in different parts of the act with different

intent." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 43 (1932).  If anything,

Congress's authorization to exclude only "certain" health care providers suggests an intent to

exclude *fewer* than those covered by FMLA's pre-existing definition.

###    C.      The intermittent leave restrictions are not authorized by the statute.

Defendants' response on intermittent leave underscores the unlawfulness and

unreasonableness of the agency's interpretation of the FFCRA.

*1.* Defendants assert that New York misunderstands intermittent leave, and contend that

leave is not "intermittent" (and thus is not subject to the Rule's restrictions) if an employee "has

taken two blocks of leave for two different qualifying reasons."  Defs.' Mem. 30.  The text of the

Final Rule does not contain the limit Defendants now advance in litigation.[7]  *See* 85 Fed. Reg. at

19,353 (§ 826.50(a)) ("intermittently" means "in separate periods of time, rather than one

continuous period").  "Deference to what appears to be nothing more than an agency's

---

[7] Defendants' reference in a footnote to the preexisting regulation for counting the "amount of leave used" under the FMLA is not relevant.  *See* Defs.' Mem. 30 n.15 (citing 29 C.F.R. § 825.200(h)).  That provision is not the same as the express definition of intermittent leave in the Final Rule; has not been applied by statute or regulation to FFCRA leave; and in any event operates to *extend*—not curtail, as the Final Rule does here—an employee's leave entitlement.

convenient litigating position would be entirely inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); *see also New York*, 414 F. Supp. 3d at 518, 533-34 & n.35.

Defendants' *post hoc* effort to mitigate the Final Rule's intermittent leave restrictions fails on its own terms as well.  Take Defendants' first example: "A worker who takes five days (40 hours) of leave to care for a child whose school is closed, returns to work, and then later takes an additional five days of leave after developing COVID-19 symptoms and seeking a diagnosis, has not taken intermittent leave."  Defs.' Mem. 30.  Assume that their legal conclusion about this fact pattern is correct—though nothing in the regulation says so.  Defendants would not deny that this same worker, if she never developed COVID-19 symptoms, would forfeit the second five days of paid sick leave because of a school closure or child care unavailability (the "same qualifying reason") unless her employer agreed.  Applying the same principle under EFMLEA would mean that an employee who initially used only three weeks of her paid family leave, where the total available paid leave is *ten weeks*, would forfeit *seven weeks* of paid leave absent her employer's agreement.  Defendants' mitigating construction does not mitigate much.

And Defendants' suggestion that the examples listed in Plaintiff's opening brief (at 19) "would [not] actually constitute intermittent leave," Defs.' Mem. 31, is entirely unexplained.  Take the example of a person with symptoms who seeks a COVID-19 diagnosis, tests negative, and then later experiences symptoms again.  This worker seeks leave for the "same qualifying reason," or at least the same statutory basis.  FFCRA § 5102(a)(3).  Nothing in the Rule indicates that these "separate periods of time" would *not* be treated as intermittent leave subject to employer approval.  If that's wrong, more than a conclusory assertion in a legal brief is required to make it so—and vacatur is warranted so the Department can codify the intermittent leave definition it now endorses.  *U.S. Dep't of Defense v. FLRA*, 982 F.2d 577, 580 (D.C. Cir. 1993).

*2.*  The Department's defense of the intermittent leave restrictions that it does acknowledge offers little in the way of textual analysis.  Defendants postulate that, because the FFRCRA does not say in so many words—"intermittent leave is permitted"—the Rule's construction is entitled to *Chevron* deference.  Defs.' Mem. 31.  But *Chevron* deference arises only *after* examining the statutory text and applying principles of statutory construction.  *See Pereira v. Sessions*, 138 S. Ct. 2105, 2113-14 (2018).  If that statutory analysis results in a conclusion that the statute "clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996).

That is the case here.  The EFMLEA leave requirement, for example, is inserted into the baseline FMLA statute—which entitles an employee to "*a total of* 12 workweeks of leave during any 12-month period for one or more" of a series of reasons, including based on school closures or childcare unavailability due to COVID-19.  29 U.S.C. 2612(a)(1) (emphasis added); FFCRA § 3102(b) (adding FMLA § 110(a)(1)(F)).  "The inclusion of the word 'total' . . . informs the reader that the [item] in question will be . . . 'a product of addition.'" *Grunley Walsh Int'l, LLC v United State*s, 78 Fed. Cl. 35, 40 (Fed. Cl. 2007).  If Congress had intended all twelve weeks to be used in a single block—or, in the Final Rule's language, "one continuous period" absent the employer's consent, 85 Fed. Reg. at 19,353 (§ 826.50(a))—there would be nothing to "total."

The EFMLEA's paid-leave language confirms the point.  The first ten days of EFMLEA leave "may consist of unpaid leave," though the employee may substitute for that unpaid leave time various types of leave (vacation, personal, medical, or sick leave) commonly understood as being capable of intermittent use.  FFCRA § 3102(b) (adding FMLA § 110(b)(1)).  Congress did not refer to the remaining ten workweeks of leave time as a single block or "continuous period";

rather, Congress stated, "[a]n employer shall provide paid leave for *each day of leave* under section 102(a)(1)(F) that an employee takes after taking leave under such section for 10 days." *Id.* (adding FMLA § 110(b)(2)(A)) (emphasis added).  This language compels the conclusion that an "employee takes" paid leave time on a day-by-day basis.

Defendants downplay this statutory text, arguing that it "simply reflects the fact that pay is allocated in certain increments."  Defs.' Mem. 32.  But the language in question is the EFMLEA's paid leave guarantee, and is "among the Act's key reforms, involving billions of dollars in spending each year."  *King*, 135 S. Ct. at 2489.  This first-of-its-kind federal provision is designed to limit the work force's acute economic pain during the most serious public health and economic calamity in perhaps the last century, when varied school and childcare center closures continue to occur and are of uncertain duration.  It is difficult to imagine a question of "deep[er] economic and political significance," *id.*, than the choice between childcare and work duties facing many American families today, and that the FFCRA was designed to address.  Had Congress intended to permit Defendants to deny an employee the full "total of" ten weeks of paid leave provided by the EFMLEA for failure to take that leave in one continuous period, "it likely would have done so" in some "prominent manner."  *Id.* at 2495.

Defendants point to an intermittent-leave provision of the FMLA, 29 U.S.C. § 2612(b), arguing that the absence of such a provision for FFCRA leave means the agency has a gap to fill.  Defs.' Mem. 32.  But that subsection imposes various conditions and limitations on the intermittent use of pre-existing types of FMLA leave.  Defendants are correct that Congress imposed no such conditions or limitations on the intermittent use of FFCRA leave—a fact that only underscores that, if Congress had wanted to impose such limitations, it would have said so.

*3.*  Finally, Defendants argue that the Final Rule's restrictions on intermittent leave are

23

essentially a policy judgment "designed to allow some flexibility while preventing the spread of COVID-19." Defs.' Mem. 31 (citing 85 Fed. Reg. at 19,336-37). Setting aside that the FFCRA does not authorize the Department to substitute its judgment for Congress's here, *see supra*, the key limitation Defendants imposed on intermittent leave has nothing to do with the spread of the disease. In Defendants' own words, the "basic condition" they imposed on "all employees who seek to take their [leave] intermittently" is that "they and their employer must agree," and that "there must be a clear and mutual understanding" to that effect. 85 Fed. Reg. at 19,336-37; *id.* at 19,353 (§ 826.50(a)). But nothing indicates that having an employer's permission to take leave intermittently makes an employee any less likely to spread COVID-19—particularly an employee who is teleworking or who is home only because of a school closure. *See id.* at 19,337 ("[T]eleworking employees present no risk of spreading COVID–19 to work colleagues."). There is no rational connection between the agency's reasons and its decision to interpose an employer's agreement as a barrier to intermittent leave. *Cf. New York*, 414 F. Supp. 3d at 544.

    **D.**    **The Final Rule's documentation requirements exceed the agency's authority.**

The Final Rule also violates the APA because it imposes documentation requirements as a precondition to leave, which Congress did not authorize. Defendants largely attempt to justify these unlawful requirements by claiming that they are "not onerous" for working families, essentially disregarding the threshold question whether Congress authorized the Department to impose the requirements in the first place. Defs.' Mem. 34.

As an initial matter, Defendants misconstrue New York's discussion of the Final Rule's notice provisions. *Id.* at 33-34. The statute's explicit restrictions on prior notice are relevant because they establish that Congress did not delegate to the Department the authority to impose paperwork preconditions on leave. *See* Pl.'s Mem. 21-22. The Final Rule's provisions mandating documentation "prior to taking" leave, 85 Fed. Reg. at 19,355 (§ 826.100(a)), and

granting employers discretion to require "additional material" or deny leave if employees do not provide it, *id.* (§ 826.100(f)), directly conflict with Congress's express command that workers be able to take emergency leave *without even informing their employers* until later. *See* FFCRA §§ 3102(b) (adding FMLA § 110(c)), 5110(5)(E). To read the FFCRA to prohibit prior notice but permit the Department to require prior documentation would be to torture the statutory text.

Sidestepping the statute's language, Defendants declare that the rule's documentation requirements are "not onerous." Defs.' Mem. 34. That conclusory assertion is not responsive— and the statutory text makes clear that Congress did not want working families to be stymied by paperwork during a crisis and while trying to manage health or child care disruptions, whether the Department considers that paperwork onerous or not. *See* FFCRA §§ 3102(b) (adding FMLA § 110(c)), 5110(5)(E). And there is no suggestion in the statute that Congress intended *employees* to be held hostage by documentation that the IRS might require of *employers* to receive tax credits in the future. Congress knows how to legislate that result when it wants. *E.g.*, 29 U.S.C. § 2613 (permitting employers to require certification for non-emergency FMLA leave); *see Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015).

Defendants also offer reasons why the documentation requirements, in their view, make good policy. Defs.' Mem. 35. But the Department's policy preferences are immaterial where, as here, it has acted beyond its authority. *Iancu*, 138 S. Ct. at 1355; *Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285, 290 (2d Cir. 2003) ("General policy concerns do not overcome the unambiguous meaning of a statute's text."). The Court should reject Defendants' efforts to substitute Congress's judgment on critical public health legislation for its own.

## CONCLUSION

New York respectfully requests that the Court vacate and set aside the challenged provisions of the Final Rule.

DATED:  May 5, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Eric R. Haren, *Special Counsel*
Fiona J. Kaye, *Assistant Attorney General*
Daniela L. Nogueira, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the State of New York*