Nicole G. Berner
Renee M. Gerni
**Service Employees International Union**
1800 Massachusetts Avenue, NW
Washington D.C. 20036
(202) 730-7468
nicole.berner@seiu.org
renee.gerni@seiu.org

Daniel J. Ratner
Allyson L. Belovin
G. Micah Wissinger
**Levy Ratner, P.C.**
80 Eighth Avenue, 8th Floor
New York, New York 10011
(212) 627-8100
dratner@levyratner.com
abelovin@levyratner.com
mwissinger@levyratner.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
STATE OF NEW YORK,

        Plaintiff,

        v.                           20 Civ. 3020 (JPO)

UNITED STATES DEPARTMENT
OF LABOR; and EUGENE SCALIA,
*in his official capacity as Secretary of Labor*,

        Defendants.
---------------------------------------------------------X

**[PROPOSED] BRIEF OF *AMICI CURIAE*
SERVICE EMPLOYEES INTERNATIONAL UNION
AND 1199SEIU, UNITED HEALTHCARE WORKERS EAST
IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................................ 1

   I.   INTRODUCTION ............................................................................................................. 2

  II.   ARGUMENT ..................................................................................................................... 4

      A.  The Human Impact of the Final Rule's Definition of Health Care Provider. ................... 4

      B.  By Denying Healthcare Workers the Right to Paid Sick Leave and Emergency Family Leave, the Final Rule Puts Our Members' and the Public's Physical and Economic Health and Well-Being at Risk......................................................................................... 10

 III.   CONCLUSION ............................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Rules**

Rule 7.1 of the Federal Rules of Civil Procedure ................................................................................ 1

**Regulations**

85 Fed. Reg. 19,326 (Apr. 6, 2020) ................................................................................................. 3, 4

**Other Authorities**

FFCRA §§ 826.30(c)(1)(i)–(iii) ............................................................................................................ 4

FFCRA § 3102(a)(2) ............................................................................................................................. 3

FFCRA § 3102(b) .................................................................................................................................. 3

FFCRA §§ 5102(a)(1)–(6) ............................................................................................................. 3, 12

Larry Buchanan, Jugal K. Patel, Brian M. Rosenthal and Anjali Singhvi, *A Month of Coronavirus in New York City: See the Hardest-Hit Areas,* N.Y. Times, April 1, 2020, https://www.nytimes.com/interactive/2020/04/01/nyregion/nyc-coronavirus-cases-map.html .....3

Lazaro Gamio, *The Workers Who Face the Greatest Coronavirus Risk*, N.Y. Times, March 15, 2020, https://www.nytimes.com/interactive/2020/03/15/business/economy/coronavirus-worker-risk.html ................................................................................................................................................11

Linda Villarosa, *A Terrible Price: The Deadly Racial Disparities of COVID-19 in America,* N.Y. Times Magazine, April 29, 2020, https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html ............................................................................................................................3

Sections 110(a)(1)(A) and (a)(2)(A) to the Family and Medical Leave Act ................................. 3

N.Y. Senate Bill 8091, Sec. 1.1(c) (Mar. 18, 2020) ....................................................................... 12

**CORPORATE DISCLOSURE STATEMENT**

*Amici curiae* herein, Service Employees International Union and 1199SEIU, United Healthcare Workers East, through their undersigned counsel, submit this disclosure statement pursuant to Rule 7.1 of the Federal Rules of Civil Procedure. These amici curiae are non-stock, nonprofit corporations. They have no parent company, and no person or entity owns them or any part of them.

**I.     INTRODUCTION**

SEIU is an international labor union representing more than two million employees nationwide, including more than one million healthcare workers. 1199 is an SEIU-affiliated local union and is New York's largest union of healthcare workers, representing approximately 350,000 workers in New York's hospitals, nursing homes, home care agencies, clinics and pharmacies. 1199 also represents approximately 100,000 healthcare workers in New Jersey, Massachusetts, Maryland, Florida and the District of Columbia.

The coronavirus pandemic has wrought an unprecedented health and economic crisis on our nation. Responsible government and public health officials have advised us that sheltering in place is the only effective means of stemming the virus. Our nation's healthcare workers, however, do not have that luxury. Rather than staying at home and insulating themselves and their families from exposure to the disease, healthcare workers are doing the important work of caring for the sick, the elderly and the infirm. As a result, they and their loved ones are getting sick. The virus has affected not only those workers who are responsible for direct patient care such as nursing staff, but also the less-celebrated and lower paid workers who keep our healthcare institutions operational during this crisis: housekeepers, dietary employees, maintenance workers, aides, and cashiers.

In New York – the epicenter of the crisis – the virus has taken a heavy toll on the population, and on healthcare workers in particular. In addition to the increased risks New York's healthcare workers and their families face because they are working rather than sheltering in place, a significant percentage of SEIU and 1199-represented healthcare workers come from low income communities and communities of color where there is a disproportionately high risk of being

exposed to, and becoming critically ill from, the virus.[1]  Data maintained by the 1199 health benefit fund shows that among 1199 members in New York City and Nassau, Suffolk and Westchester Counties alone, more than 12,400 of our members have been diagnosed with COVID-19, more than 900 have been hospitalized for coronavirus-related conditions, and more than 130 have died from the disease.

The Families First Coronavirus Response Act ("FFCRA")[2] establishes important safety nets for workers during this crisis by providing for (1) paid sick leave when workers are infected themselves, need to care for a family member who has been infected, or need to care for a child whose school is closed (FFCRA §§ 5102(a)(1)–(6)), and (2) extended family medical leave if a worker is unable to work because s/he must care for a child due to the coronavirus (FFCRA §§ 3102(a)(2); 3102(b) (adding Sections 110(a)(1)(A) and (a)(2)(A) to the Family and Medical Leave Act).  These protections allow workers to attend to themselves and their families without suffering severe economic consequences.  These safety nets are critical for healthcare workers in New York and beyond because they have been, and continue to be, so significantly impacted by the virus.

The US Department of Labor's rule interpreting FFCRA ("Final Rule") creates several loopholes that make these important benefits unavailable to the workers who need them.  85 Fed.

---

[1] *See, e.g.,* Larry Buchanan, Jugal K. Patel, Brian M. Rosenthal and Anjali Singhvi, *A Month of Coronavirus in New York City: See the Hardest-Hit Areas,* N.Y. Times, April 1, 2020, https://www.nytimes.com/interactive/2020/04/01/nyregion/nyc-coronavirus-cases-map.html; Linda Villarosa, *A Terrible Price: The Deadly Racial Disparities of COVID-19 in America,* N.Y. Times Magazine, April 29, 2020, https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html.

[2] The FFCRA encompasses several pieces of legislation, including the Emergency Paid Sick Leave Act and the Emergency Family and Medical Leave Expansion Act. The FFCRA was also amended by the Coronavirus Aid, Relief, and Economic Security Act. For clarity and expediency, the full legislation package, as amended, is referred to as "FFCRA" throughout this brief, and citations are made directly to the relevant sections of the FFCRA.

Reg. 19,326 (Apr. 6, 2020).  One such loophole is the Final Rule's overly broad definition of "health care provider." Final Rule at §§ 826.30(c)(1)(i)–(iii).  Indeed, the Final Rule's definition is so expansive that it would eliminate the right to paid sick leave and emergency family leave for virtually every one of the more than one million healthcare workers represented by SEIU and its affiliates, including the more than 350,000 1199 members in New York State. Accordingly, the members of SEIU and 1199 have a direct and substantial interest in the resolution of this litigation.

Rather than focusing on the legal arguments establishing that the Final Rule is unlawful under the Administrative Procedure Act, this amicus brief provides the Court with the human impact of the Final Rule. The workers' stories told below, which are emblematic of healthcare workers' experiences in New York and nationwide, show that the breadth of the Final Rule's definition of "health care provider" is already depriving and will continue to deprive millions of workers of the paid sick leave and emergency family leave that they so desperately need during this crisis.

## II.    ARGUMENT

### A.    The Human Impact of the Final Rule's Definition of Health Care Provider.

1. *Sonia Catwell, Nursing Assistant*

Sonia Catwell is a 62-year-old 1199 member who has worked as a Nursing Assistant at Upper East Side Rehabilitation Center in Manhattan for almost thirty years. To get to work each day from her home in Newark, New Jersey, Ms. Catwell takes New Jersey Transit and two New York City subway lines.  She earns $19.89/hour caring for the nursing home's residents, including bathing them, dressing them, serving them meals, and transferring them to and from wheelchairs. A number of residents and employees at the nursing home have tested positive for COVID-19.  In

addition to her job at the nursing home, Ms. Catwell also worked a second job in order to make ends meet.

In late March Ms. Catwell went to a hospital emergency room because she was experiencing coronavirus symptoms. The hospital did not administer a COVID-19 test because they had limited tests and were only testing those admitted for emergency treatment. Ms. Catwell was advised by an emergency room health professional that she likely had the virus and she should not to go to work for at least fourteen (14) days. She was out of work for three (3) weeks. The nursing home required her to use whatever accrued paid time off she had, which was three (3) days, and then did not pay her for the remaining eighteen (18) days she was out of work.

Unable to lose any more pay, Ms. Catwell returned to work before she was fully recovered. She had already missed a mortgage payment, and paid other bills late, including her car insurance bill; she simply could not afford to take any more time off. Ms. Catwell also lost the supplemental income from her second job. She simply does not feel well enough to work more hours than her job at the nursing home requires. Each evening after she leaves the nursing home, and takes three trains to return home to New Jersey, she makes something to eat and goes straight to bed.

Ms. Catwell is worried that if her health worsens and she needs to miss more work, she will be unable to pay her mortgage and other bills. She is also worried that by going to work when not fully recovered she is exposing her co-workers, the nursing home residents, and her fellow commuters on the New Jersey Transit and New York City Subway systems to the virus.

2. *Diamind Lamont and Yerovick Cedillo, CNAs*

1199 members Diamind Lamont and Yerovick Cedillo are both single parents who worked as a Certified Nursing Attendants ("CNAs") at Montgomery Nursing Home in Orange County, New York earning less than $15 per hour. Despite their low wages, Ms. Lamont and Ms. Cedillo


were dedicated to the residents they cared for and appreciated the benefits their union job provided, including health insurance for them and their children.

When Ms. Lamont went to work to care for the residents at the nursing home, her mother cared for her two-year-old daughter. Ms. Cedillo's nine-year-old son is in the third grade.

On or about March 27, Ms. Lamont was sent home from work because she had a fever; her employer instructed her to quarantine for two (2) weeks. Subsequently, she tested positive for COVID-19. After completing the two-week quarantine period, Ms. Lamont would have been able to return to work, but for the fact that her mother was no longer able to care for her daughter because she too had contracted the virus and was ill. Ms. Lamont was now the only child-care option for her daughter. She contacted the nursing home on numerous occasions and inquired about leave, including family leave. She never got a response; the home simply stopped paying her and ultimately told her she was "no longer on payroll."

Ms. Cedillo was ending a trip out of the country when the coronavirus crisis first emerged in New York. She was advised by her employer to quarantine for fourteen (14) days prior to returning to work. While Ms. Cedillo was at home during the quarantine period, Governor Cuomo ordered the closing of all New York State Schools, which meant that Ms. Cedillo was now the primary child care provider for her son. Ms. Cedillo advised her employer that she would not be able to return to work because she needed to care for her son; she inquired about leave options. Rather than providing her with leave, paid or unpaid, the nursing home notified her that by not coming to work she had abandoned her job and was deemed to have resigned. Ms. Cedillo notified the employer that she did not in fact resign. The nursing home told her that she could re-apply for a job if/when she resolved her child care issues. Ms. Cedillo was forced to choose between her job and caring for her child, and when she chose her child, she was fired.

Without a job, Ms. Lamont has fallen behind on her bills. She is concerned that she will not be able to catch up on rent and will not be able to renew her lease, which expires in June. She does not know where she and her daughter will live if that occurs. Ms. Lamont has also lost health insurance for herself and her daughter and she is worried that she will not be able to obtain further testing and treatment for a kidney issue. Ms. Cedillo applied for, and is receiving, unemployment insurance, thereby unnecessarily using money and resources from an already burdened New York State unemployment insurance system. Ms. Cedillo also lost her health insurance and is afraid that if she gets sick or injured, it could be financially disastrous.

3. *Cynthia Morris, CNA*

Cynthia Morris, a 41-year-old African-American mother, is an 1199 member who works as a CNA at The Grand Rehabilitation and Nursing at Southpoint, a nursing home located in Island Park, New York. Ms. Morris has worked at the nursing home for three (3) years and currently earns $18.84 per hour caring for residents, including serving them meals, assisting them with toileting and bathing, dressing them, and transferring them to and from wheelchairs. A number of residents and employees at the nursing home have tested positive for COVID-19. Ms. Morris did not know she was working with COVID-19 patients and was only recently provided with a single N95 mask. Ms. Morris developed coronavirus symptoms and had a tele-med system appointment with a doctor who advised her she likely had the virus and instructed her to self-quarantine for fourteen (14) days. Subsequently, Ms. Morris took two (2) antibody tests, both of which were positive for COVID-19. Ms. Morris was out of work for two (2) weeks, during which time she was not paid. In order to pay her bills, she was forced to ask others for financial assistance.

4. *Samuel Montalvo, Housekeeper*

1199 member Samuel Montalvo is a 59-year old Puerto Rican man who works as a Housekeeper at Rockway Care Center in Queens, New York. He has worked at the nursing home for twenty-three (23) years and currently earns $17.41 per hour. To get to work each day, Mr. Montalvo takes a city bus.

A number of residents and employees at the nursing home have tested positive for COVID-19. After experiencing coronavirus symptoms himself, Mr. Montalvo saw a doctor who told him he likely had the virus and suggested that he self-quarantine. Mr. Montalvo was out of work for ten (10) days, during which time he was not paid. Each day he was out, his employer would call him and ask for his temperature. Once Mr. Montalvo was fever free for three consecutive days, the employer insisted he return to work. Feeling pressure from the employer, and not wanting to lose any more pay, Mr. Montalvo returned to work even though he did not feel fully recovered. Additionally, in order to recoup the money he lost, he worked overtime hours even though he was not feeling well.

After returning to work, Mr. Montalvo was worried that he would not recover as quickly or that he would relapse. Additionally, by returning to work before he was fully recovered, Mr. Montalvo risked exposing his co-workers, the nursing home residents, and the public to the virus.

5. *Nicolee Ennis, CNA*

Nicolee Ennis is a 32-year-old CNA who has worked at Split Rock Rehabilitation and Health Care Center in the Bronx for the last four (4) years. Unbeknownst to Ms. Ennis or her co-workers, several residents at the nursing home tested positive for COVID-19 and/or had coronavirus symptoms. Ms. Ennis and her co-workers provided intimate care for these residents with limited Personal Protective Equipment ("PPE"). Predictably, many Split Rock workers

became sick. One of Ms. Ennis' co-workers died and at least one other was hospitalized and put on a ventilator; others were out of work for extended periods.

Ms. Ennis had a severe cough, a fever and lost her sense of smell. A doctor advised that based on her symptoms she likely had the virus. Ms. Ennis shares an apartment in Co-op City with her 9-year old son and boyfriend who both became sick. Eventually Ms. Ennis and her boyfriend were able to obtain tests by driving to a Nassau County testing site. Although her test was negative, Ms. Ennis's boyfriend's test was positive. A doctor advised that given the close quarters in which they live and Ms. Ennis' symptoms, her test was most likely a false negative.

After being out sick for almost a month, Ms. Ennis returned on April 26 to find that she would not be paid for her time out of work because she refused to allow the employer to draw down all her accrued vacation time. Ms. Ennis was forced to borrow money from her mother to pay bills. Additionally, Ms. Ennis went back to work before she felt fully recovered because she was worried that she could lose her job and health insurance. By doing so, she not only put her own health at risk, but risked exposing her co-workers, the nursing home residents, and the general public to the virus.

6. *Mercedez Gutierez, CNA*

Mercedez Gutierez, an 1199 member in Miami, Florida, became exposed to COVID-19 while caring for an infected resident at Hialeah Nursing & Rehabilitation Center where she has worked as a CNA for the last year. She tested positive for the virus and has been out of work since on or about April 9, 2020. She has not been paid for any of her time out of work.

This has created a sever economic hardship, particularly because her husband has also been out of work due to the pandemic shutdown. She is worried that they will not be able to pay their bills.

7. <u>S.L., CNA</u>

As a CNA at a nursing home in Miami, Florida, S.L. had contact with at least three residents who tested positive for COVID-19. Her employer did not notify her at the time that the patients she was assigned to care for were COVID-19 positive. S.L. became sick and has been out of work for approximately one month. S.L. lives with her husband, who is a diabetic. Since she has been out of work, S.L. received one pay check for $200, which represented the nineteen (19) hours of paid time off that remained in her bank; she was not paid for any other time. She is worried about how she is going to pay her mortgage and other bills. She has just been cleared to return to work, but she is worried about doing so because of her own health and her husband's high-risk condition. But she is also worried that if she does not return to work, she will not be able to pay her mortgage and other bills.

S.L. has requested that we not use her full name or identify the nursing home where she works because she fears retribution from her employer.

**B.    By Denying Healthcare Workers the Right to Paid Sick Leave and Emergency Family Leave, the Final Rule Puts Our Members' and the Public's Physical and Economic Health and Well-Being at Risk.**

As the stories above illustrate, the Final Rule's expansive definition of "health care provider," such that virtually every healthcare worker can be exempt from the paid sick leave and/or emergency family leave provisions, leaves healthcare workers in entirely untenable positions during this crisis.

Working in hospitals, nursing homes and other healthcare institutions places healthcare workers at an increased risk for contracting the virus.[3]  This is especially true when the existence of the virus is hidden from workers, as it was from Nicolee Ennis and Cynthia Morris.  If these workers are not paid for the days, or even weeks, when they are out of work when they predictably contract the virus – as was the case for Sonia Catwell, Cynthia Morris, and Samuel Montalvo – they will suffer serious economic hardship.  While some employers may debit employees paid-time-off banks rather than simply make the workers go without pay, this is little comfort as the workers then have no time left if they get sick or otherwise need time off work in the future, the very concern shared by Mercedez Gutierez and S.L.  On the other hand, if healthcare workers are unable to go without pay, and are forced to come to work while sick, like Sonia Catwell, Samuel Montalvo, and Nicolee Ennis, they risk their own health and expose their co-workers, their patients, and the general public to the virus.

Healthcare workers are also husbands, wives, partners, children and parents.  These household members are at increased risk for contracting the disease because they live with someone who cannot stay at home or practice social distancing.  If a healthcare worker is not paid to stay home and care for a sick family member, and is unable to go without pay, she not only leaves a loved one uncared for, but she also brings that loved one's virus into the workplace and out into the world at large. Additionally, with New York State schools and day care centers closed, child care is now an extreme challenge for all parents, but particularly for health care providers because few people are willing to care for the child of someone who is regularly exposed to the

---

[3] Lazaro Gamio, *The Workers Who Face the Greatest Coronavirus Risk*, N.Y. Times, March 15, 2020,  https://www.nytimes.com/interactive/2020/03/15/business/economy/coronavirus-worker-risk.html ("Health care workers are at the greatest risk — they can encounter diseases and infections daily and typically work in close proximity to one another and their patients.")

virus or who is simply unable to stay home and/or practice social distancing. As a result, many healthcare workers, especially the large number who are single parents, have no choice but to stay at home with their children while schools and day care centers remain shuttered. Without the right to emergency family leave, these workers risk losing their jobs, just like Diamind Lamont and Yerovick Cedillo did.

It is no answer to these stories of anguish to say that the Final Rule encourages employers to be "judicious" in denying these benefits to their workers.[4] In the experience of Amici, who collectively represent workers employed by thousands of employers throughout the country, far too many employers – like the employers in the stories above – do not exercise restraint when presented with the opportunity to take advantage of a legal loophole; rather, far too often, employers subordinate the best interests of their employees to their own economic and operational interests. There is no reason to expect that employers will act differently simply because the Department of Labor has "encouraged" them to be "judicious."

## III. CONCLUSION

The Final Rule, if allowed to stand, would have severe and lasting consequences for healthcare workers in New York and across the country. Accordingly, amici SEIU and 1199

---

[4] Nor would it be an adequate response to suggest that New York healthcare workers are not harmed by an exemption from FFCRA because they are otherwise covered by state emergency relief legislation. While FFCRA and New York State law provide some overlapping benefits, there are significant benefits under FFCRA that do not exist under state law. New York state law mandates full paid leave for sick employees only if the employee is under a mandatory government order of quarantine or isolation, *see* N.Y. Senate Bill 8091, Sec. 1.1(c) (Mar. 18, 2020), whereas under FFCRA sick employees are also eligible for paid leave if they have been advised to quarantine or isolated by a medical professional (§ 5102(a)(2)), are experiencing COVID-19 symptoms and seeking a diagnosis (§ 5102(a)(3)), or are experiencing a substantially similar condition (§ 5102(a)(6)). FFCRA also covers care for children whose schools have closed due to COVID-19 (§ 5102(a)(5)).

respectfully urge the Court to issue an order holding unlawful, vacating and setting aside the challenged provisions of the Final Rule as requested by Plaintiff State of New York.

Dated: May 11, 2020  
New York, New York

Respectfully submitted,

By:    Allyson L. Belovin

NICOLE G. BERNER  
RENEE M. GERNI  
SERVICE EMPLOYEES  
INTERNATIONAL UNION

DANIEL J. RATNER  
ALLYSON L. BELOVIN  
G. MICAH WISSINGER  
LEVY RATNER, P.C.

*Attorneys for Proposed Amici Curiae*  
*Service Employees International Union and*  
*1199SEIU, United Healthcare Workers East*