UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK,

Plaintiff,

-v-

UNITED STATES DEPARTMENT OF
LABOR, *et al.*

Defendants.

20-CV-3020 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

The ongoing COVID-19 pandemic has visited unforeseen and drastic hardship upon American workers.  In response to this extraordinary challenge, Congress passed the Families First Coronavirus Response Act, which, broadly speaking, entitles employees who are unable to work due to COVID-19's myriad effects to federally subsidized paid leave.  Congress charged the Department of Labor ("DOL") with administering the statute, and the agency promulgated a Final Rule implementing the law's provisions.  *See* 85 Fed. Reg. 19,326 (Apr. 6, 2020) ("Final Rule").

The State of New York brings this suit under the Administrative Procedure Act, claiming that several features of DOL's Final Rule exceed the agency's authority under the statute.  The parties have cross-moved for summary judgment, and DOL has moved to dismiss for lack of standing.  For the reasons that follow, the Court concludes that New York has standing to sue and that several features of the Final Rule are invalid.  New York's motion for summary judgment is therefore granted in substantial part, as explained below.

I.      **Background**

"COVID-19 [is] a novel severe acute respiratory illness that has killed . . . more than 1[5]0,000 nationwide" to date.  *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct.

1613, 1613 (2020) (Mem.) (Roberts, C.J., concurring in denial of application for injunctive relief); *see also* Centers for Disease Control and Prevention, Coronavirus Disease 2019: Cases and Deaths in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last visited Aug. 1, 2020).  "At this time, there is no known cure, no effective treatment, and no vaccine.  Because people may be infected but asymptomatic, they may unwittingly infect others."  *South Bay United Pentecostal Church*, 140 S. Ct. at 1613. Accordingly, social-distancing measures have been taken nationwide, by state and local governments and by civil society, to stem the spread of the virus.  The impact on American workers is multifold, as both the infection itself and the public-health response have been dramatically disruptive to daily life and work.

The legislation at the heart of this litigation, the Families First Coronavirus Response Act, is one of several measures Congress has taken to provide relief to American workers and to promote public health.  *See* Pub. L. No. 116-127, 134 State. 178 (Mar. 18, 2020) ("FFCRA"). Broadly speaking, and as relevant here, the FFCRA obligates employers to offer sick leave and emergency family leave to employees who are unable to work because of the pandemic.  By granting the employers a corresponding, offsetting tax credit, Congress subsidizes these benefits, though the employers front the costs.

This litigation involves two major provisions of that law: the Emergency Family and Medical Leave Expansion Act ("EFMLEA ") and the Emergency Paid Sick Leave Act ("EPSLA").

### A.    Emergency Family and Medical Leave Expansion Act

As its name suggests, the EFMLEA entitles employees who are unable to work because they must care for a dependent child due to COVID-19 to paid leave for a term of several

weeks.[1]  *See* FFCRA §§ 3102(a)(2); 3102(b).  Formally, it is an amendment to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*  Congress ultimately foots the bill for these benefits, by way of a tax credit to the employer or self-employed individual.  *See* FFCRA §§ 7003(a), 7004(a).

An employer of "an employee who is a health care provider or emergency responder may elect to exclude such employee" from the benefits provided by the EFMLEA.  *See* FFCRA § 3105.  The FMLA defines "health care provider" as "a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate)," or "any other person determined by the Secretary to be capable of providing health care services."  29 U.S.C. § 2611(6)(B).

### B.    Emergency Paid Sick Leave Act

The EPSLA requires covered employers to provide paid sick leave[2] to employees with one of six qualifying COVID-19-related conditions.  *See* FFCRA §§ 5102, 5110(2).  The conditions include that the employee: (1) "is subject to a Federal, State, or local quarantine or isolation order related to COVID-19"; (2) "has been advised by a health care provider to self-quarantine due to concerns related to COVID-19"; (3) "is experiencing symptoms of COVID-19 and seeking a medical diagnosis"; (4) "is caring for an individual subject" to a quarantine or isolation order by the government or a healthcare provider; (5) is caring for a child whose school or place of care is closed, or whose childcare provider is unavailable, because of COVID-19; or (6) "is experiencing any other substantially similar condition specified by the Secretary of Health

---

[1] The first ten days for which an employee of a covered employer takes emergency family leave under the EFMLEA may be unpaid, but after ten days, employees are entitled to job-protected emergency family leave at two-thirds of their regular wages for another ten weeks. *See* FFCRA § 3102(b) (adding FMLA § 110(b)(2)).

[2] The EPSLA entitles full-time employees to 80 hours — or roughly two weeks — of job-protected paid sick leave.  *Id.* §§ 5102(b)(2)(A), 5104(1).

and Human Services in consultation with the Secretary of the Treasury and the Secretary of Labor." *Id.* § 5102(a).  In parallel to the EFMLEA's exemption for healthcare providers, under the EPSLA, an employer may deny leave to an employee with a qualifying condition if the employee "is a health care provider or an emergency responder." *Id.*  The statute specifies that "health care provider" has the same meaning given that term in the FMLA. *Id.* § 5110(4) (citing 29 U.S.C. § 2611).  And the Secretary of Labor "may issue regulations to exclude certain health care providers and emergency responders from the definition of employee." *Id.* § 5111(1).  As it does under the EFMLEA, the federal government ultimately covers the cost of the benefits through a tax credit to employers.  FFCRA §§ 7001(a), 7002.

C.      **The Department of Labor's Final Rule**

On April 1, 2020, DOL promulgated its Final Rule implementing the FFCRA.[3]  As explained in greater detail below, the present challenge relates to four features of that regulation: its so-called "work-availability" requirement; its definition of "health care provider"; its provisions relating to intermittent leave; and its documentation requirements.  Broadly speaking, New York argues that each of these provisions unduly restricts paid leave.

On April 14, 2020, New York filed this suit and simultaneously moved for summary judgment.  (*See* Dkt. No. 1.)  On April 28, 2020, DOL cross-moved for summary judgment and moved to dismiss for lack of standing.  (*See* Dkt. No. 24.)  Those motions are now fully briefed, and the Court has received the brief of amici curiae Service Employees International and 1199SEIU, United Healthcare Workers East in support of New York.[4]  (*See* Dkt. No. 31.)  The Court heard oral argument on May 12, 2020.

_____

[3] The Rule was promulgated without notice-and-comment procedures, pursuant to a statutory designation of good cause under the APA.  *See* FFCRA §§ 501(a)(3), 5111.

[4] The unions' motion to file their amicus brief is granted.  (*See* Dkt. No. 31.)

## II.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "a party seeks review of agency action under the APA, the 'entire case on review is a question of law,' such that 'judicial review of agency action is often accomplished by filing cross-motions for summary judgment.'" *Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012) (alteration and citation omitted). Sitting as an "appellate tribunal," the district court must "decid[e], as a matter of law, whether the agency action is . . . consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

## III.    Discussion

### A.     Standing

The Court's analysis begins with its jurisdiction, specifically the State of New York's standing to sue. Though DOL styled its objection to New York's standing as a motion to dismiss pursuant to Rule 12(b)(1), "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). New York has moved for summary judgment on its claims, and it bears the burden of proof at trial to show its own standing. Irrespective of DOL's labeling, then, New York must demonstrate, through "affidavit or other evidence," *id.* at 561, that there exists no genuine dispute of material fact that it has standing, as it must do with respect to every element of its claim to obtain summary judgment.

To establish its constitutional standing, New York must demonstrate (1) an injury in fact . . . [that is] concrete and particularized [and] actual or imminent, not conjectural or

hypothetical," (2) that the injury is "fairly traceable to the challenged action," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560 (internal alterations, quotation marks, and citations omitted).  All three components of standing — injury-in-fact, causation, and redressability — are contested here.

In the context of state standing, courts generally recognize three types of constitutionally cognizable injuries.  First, like a private entity, a state may suffer a direct, proprietary injury, for example, a monetary injury.  *See New York v. Mnuchin*, 408 F. Supp. 3d 399, 408 (S.D.N.Y. 2019).  Second, a state may suffer an injury to its so-called "quasi-sovereign interests."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).  Though the universe of "quasi-sovereign interests" has never been comprehensively defined, it is understood to encompass both "the health and well-being — []physical and economic — of its residents in general," as well as the state's interest in "not being discriminatorily denied its rightful status within the federal system."  *Id.*  When a state sues to vindicate its quasi-sovereign interests, it is said to be suing in its *parens patriae* capacity.  *Id.*  (The third type of injury, which is not at issue in this case, is an injury to a sovereign interest, such as "the power to create and enforce a legal code," *id.*, or those implicated in the "adjudication of boundary disputes or water rights," *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000).)  Importantly, these categories (proprietary, quasi-sovereign, and sovereign) are not hermetically sealed from one another, and a single act may injure a state in more than one respect.

New York claims that the Final Rule's challenged features, which either limit paid leave or burden its exercise, impose both proprietary and quasi-sovereign injuries on the state.  (*See* Dkt. No. 27 at 3–13.)  Without paid leave, New York argues, employees must choose between taking unpaid leave and going to work even when sick.  (*See* Dkt. No. 27 at 7–13.)  Some

6

employees will elect the former, the State predicts, diminishing their taxable income and therefore the State's tax revenue.  (*See* Dkt. No. 27 at 11–13.)  Some will choose the latter, escalating the spread of the virus and thereby raising the State's healthcare costs.  (*See* Dkt. No. 27 at 7–10.)  And overall, the bind employees are left in will result in greater reliance on various state-administered programs, increasing the State's administrative burden.  (*See* Dkt. No. 27 at 10–11.)

These predictions are supported by New York's record evidence, which consists of declarations from public-health and policy experts opining, based on empirical studies, that when paid leave is diminished, fewer sick employees take leave, transmission of flu-like diseases rises, and more employees take unpaid leave.  (*See* Dkt. No. 26, Ex. 1, ¶ 17; Dkt. No. 26, Ex. 4 ¶ 12.) Indeed, the Final Rule itself is grounded in an acknowledgement that a dearth of paid leave will result in employees' being "forced to choose between their paychecks and the individual and public health measures necessary to combat COVID-19."  Final Rule at 19,335.  The evidence also suggests that the predictable consequence of the Final Rule will be less taxable income for the state, because both regular wages and paid leave benefits are taxable income, but unpaid leave generates no taxable income.  (*See* Dkt. No. 26, Ex. 3.)  Because "[a] state's 'loss of *specific* tax revenues' is a 'direct [proprietary] injury' capable of supporting standing," New York may sue to vindicate this "[e]xpected financial loss."  *New York*, 408 F. Supp. 3d at 409 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992)) (emphasis added).

DOL complains that New York's evidence is insufficient because at summary judgment, the State is required to show "empirical" evidence quantifying these effects "in minimally concrete numbers and terms."  (Dkt. No. 30 at 5.)  But no precedent requires the Court to disregard non-quantitative evidence, or to demand specific numerical projections.  To the

contrary, because even "an identifiable trifle" suffices to demonstrate standing, *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973), all New York must show is that it will be injured, not the magnitude of its injury.  Indeed, the very out-of-circuit precedent cited by DOL eschews any notion that the specific amount of the financial loss, rather than the mere fact of it, must be shown to demonstrate standing.  *See Massachusetts v. U.S. Dep't of Health and Human Servs.*, 923 F.3d 209, 226 (1st Cir. 2019) ("The Departments' attack on the accuracy of the numbers provided by the Commonwealth misses the point: the Commonwealth need not be exactly correct in its numerical estimates in order to demonstrate an imminent fiscal harm."); *id.* ("Whether costs to the Commonwealth are above or below this [estimate], they are not zero.")  In urging that New York's injury is not sufficiently "concretized," DOL confuses a qualitatively concrete harm, which the standing precedents require, with a quantitatively concrete harm, which has no special constitutional significance.

Nor is the causal chain between the challenged action and the predicted harm too attenuated.  The chain consists of few links, none of which DOL can seriously contest: Restricting eligibility and increasing administrative burdens for paid leave will reduce the number of employees receiving paid leave; some employees who need leave will therefore take unpaid leave;[5] their income will decrease, shrinking the state's income tax base.  Despite the federal government's characterization, this is hardly an argument "that actions taken by United States Government agencies [will] injure[] a State's economy and thereby cause[] a decline in general tax revenues."  *Wyoming*, 502 U.S. at 448.  To the contrary, it is the specific and

---

[5] The Court need not and does not address the alleged diminution in the State's *sales* tax revenue, which admittedly rests on a more attenuated causal chain.

imminently threatened diminution of an identifiable source of tax revenue.  And by the same

token, New York's injury will be redressed by a favorable ruling.  *See Carpenters Indus. Council*

*v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (Kavanaugh, J.) ("Causation and redressability

typically overlap as two sides of a causation coin . . . . [I]f a government action causes an injury,

enjoining the action usually will redress that injury." (citation and internal quotation marks

omitted)).

Because the threatened injury to New York's tax revenue is sufficient to support

standing, the Court need not address the state's alternative theories of standing, namely, the

potential burden on its healthcare system or the injury to its quasi-sovereign interests.[6]

---

[6] Though the Court does not reach New York's argument regarding *parens patriae*
standing, a few words are in order about that theory.  By invoking its *parens patriae* standing,
New York invites the Court to enter something of a legal thicket.  It is well established that an
injury to a State's quasi-sovereign interest fulfills Article III's requirement that a State suffer an
injury-in-fact.  *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.  But the courts have also long
recognized that generally, at least in constitutional cases, a State may not invoke its *parens
patriae* standing against the federal government, because, the traditional justification goes, "[i]n
that field, it is the United States, and not the State, which represents them as *parens patriae*."
*Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923).  This common-law limitation is known as
the "*Mellon* bar," named for the almost hundred-year-old case in which it was first articulated.
*See id.*

The success of New York's *parens patriae* argument turns on a fundamental but arguably
unresolved doctrinal question about the *Mellon* bar: Does *Mellon* apply in suits, like this one,
brought by a state to enforce a statute rather than the Constitution?  *See Connecticut v. U.S.
Dep't of Commerce*, 204 F.3d 413, 415 n.2 (2d Cir. 2000) (declining to address question).  The
traditional justification for the judge-made limitation would seem to hold no water in that
context, because "[t]he prerogative of the federal government to represent the interests of its
citizens . . . is not endangered so long as Congress has the power of conferring or withholding"
the statutory right.  *Maryland People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985)
(Scalia, J.).

New York contends that the Supreme Court's decision in *Massachusetts v. EPA*
definitively resolves this doctrinal question in favor of a state's *parens patriae* standing in
statutory actions.  (*See* Dkt. No. 27 at 3–5; *see also* 549 U.S. 497 (2007).)  The *Massachusetts*
majority's discussion of *parens patriae* standing is not a paragon of clarity, but that case aside,
sound arguments nonetheless still seem to support the conclusion that the *Mellon* bar does not
prohibit suits in which Congress has conferred a statutory cause of action upon a state.  There is

no serious question that a quasi-sovereign injury satisfies the "irreducible minimum" of *Article III* standing; "[o]therwise the numerous cases allowing *parens patriae* standing in suits not involving the federal government would be inexplicable." *Maryland People's Counsel*, 760 F.2d at 321. Moreover, as noted at the outset, the traditional justification for the *Mellon* bar is seemingly inapt in the context of claims involving statutory rights. And the imposition of a judge-made, prudential bar to suit when there exists a constitutional case or controversy and Congress has endowed the litigant with a statutory cause of action is seemingly incongruous with the modern recognition that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging," *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014) (internal quotation marks and citation omitted), as well as with basic separation-of-powers principles.

The relevant question, then, would seem to be not whether the state has *constitutional* standing to bring a suit in its *parens patriae* capacity (it does, if it has suffered a quasi-sovereign injury), but rather whether the state has *statutory* standing. Or, to use modern parlance, the relevant question is whether the state's congressionally conferred cause of action is capacious enough to support a *parens patriae* suit. *See Lexmark*, 572 U.S. at 128 n.4 (2014) (explaining that "prudential standing" is really a question of a litigant's cause of action). Indeed, even Defendants accept the conclusion that *if* Congress has furnished a cause of action to New York for this kind of suit, the *Mellon* bar has no application. (*See* Dkt. No. 25 at 13.) That conclusion squares with the Second Circuit's approach in *parens patriae* cases involving private defendants, which distinguishes between the question of constitutional injury to a quasi-sovereign interest and statutory standing to bring a *parens patriae* action. *See Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 120 (2d Cir. 2002). The touchstone, then, is congressional intent.

The D.C. Circuit, which DOL invokes repeatedly, takes just such an approach. That court has long recognized "that the courts must dispense with [the *Mellon* bar] if Congress so provides." *Maryland People's Counsel,* 760 F.2d at 321; *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) ("Because the *Mellon* bar is prudential, we have held that the Congress may by statute authorize a State to sue the federal government in its *parens patriae* capacity."). And though a recent D.C. Circuit opinion, heavily relied upon by the federal government here, held that the general cause of action in the APA did not *alone* evince an intent to authorize *parens patriae* suits by states against the federal government, it withheld judgment on the forfeited argument that the underlying statute forming the basis of the action (in that case, the National Environmental Policy Act) did so. *Id.* n.4. In short, the D.C. Circuit did not adopt a bright-line rule that APA suits can never be brought in a state's *parens patriae* capacity, but rather indicated that the question may turn on congressional intent as expressed in the *underlying* statute that the litigant claims was violated. That the inquiry might turn on the underlying statute is consistent with direct-injury cases under the APA, where the question of "statutory standing" (*i.e.*, the cause of action) also turns on "the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 (1991) (internal quotation marks and citation omitted).

Having determined that the State possesses standing based on its proprietary injury to its tax revenue, the Court proceeds to the merits.

### B.        The Work-Availability Requirement

New York's first challenge goes to a fundamental feature of the regulatory scheme, the work-availability requirement.  By way of reminder, the EPSLA grants paid leave to employees who are "unable to work (or telework) due to a need for leave because" of any of six COVID-19-related criteria.  FFCRA § 5102(a).  The EFMLEA similarly applies to employees "unable to work (or telework) due to a need for leave to care for . . . [a child] due to a public health emergency."  FFCRA § 101(a)(2)(A).  The Final Rule implementing each of these provisions, however, excludes from these benefits employees whose employers "do[] not have work" for them.  *See* Final Rule at 19,349–50 (§§ 826.20(a)(2), (6), (9), (b)(1)).

The limitation is hugely consequential for the employees and employers covered by the FFCRA, because the COVID-19 crisis has occasioned the temporary shutdown and slowdown of countless businesses nationwide, causing in turn a decrease in work immediately available for employees who otherwise remain formally employed.  The work-availability requirement may therefore greatly affect the breadth of the statutory leave entitlements.

The question posed to the Court is whether the work-availability requirement is consistent with the FFCRA.  But before turning to that central issue, the Court must address the

---

That understanding has considerable virtues: it harmonizes *parens patriae* cases with modern standing doctrine, and it confines the *Mellon* doctrine to its justifiable limits.  Neither party here, however, has briefed the question of precisely how this Court should discern such congressional intent — for example, whether the normal zone-of-interests test for statutory standing under the APA applies, or whether, in *parens patriae* suits against the federal government, federalism concerns require something more searching.  And ultimately, the State's direct, proprietary injury is sufficient to confer constitutional standing, and the federal government has not disputed that the State possesses a right of action to vindicate that injury.  The Court therefore need not decide these thorny academic issues.

antecedent question of the work-availability requirement's scope.  Specifically, in the context of

the EPSLA, the express language of the Final Rule applies the work-availability requirement to

only three of the six qualifying conditions.  *See* Final Rule at 19,349–50 (§ 826.20(a)(2), (6),

(9).)  DOL nonetheless urges the Court to superimpose the requirement onto the three remaining

conditions.  In its view, the statute's language compels the work-availability requirement, and

therefore, the Final Rule must be interpreted to apply it to each of the six enumerated

circumstances.  (*See* Dkt. No. 30 at 8.)

　　　　Even if DOL's statutory premise were correct, however, its conclusion would not follow.

No canon of regulatory interpretation requires this Court to adopt a saving construction of the

Final Rule, or to interpret it so as to avoid conflict with the statute.  To the contrary, the Court

must interpret the Final Rule based on its "text, structure, history, and purpose."  *Kisor v. Wilkie*,

139 S. Ct. 2400, 2415 (2019).  In arguing that the regulation must be interpreted consistent with

the statute, even if such an interpretation is contrary to the regulation's unambiguous terms, DOL

puts the proverbial cart before the horse.[7]

　　　　This Court therefore undertakes anew the task of interpreting the Final Rule, and in so

doing, concludes that its terms are clear:  The work-availability requirement applies only to three

---

[7] The doctrine of *Auer* or *Seminole Rock* deference is of no help to DOL here.  Just last term, the Supreme Court made clear that "convenient litigating positions" are not entitled to such deference, *Kisor*, 139 S. Ct. at 2417, and DOL has not explained how the interpretation advanced before this Court is anything more than a newly articulated litigating position.

　　　　It is true that deference to an interpretation of a regulation embodied in the regulation's preamble is usually warranted, as it "is evidence of an agency's contemporaneous understanding of its proposed rules."  *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 52–53 (2d Cir. 2016) (citation omitted).  But the preamble only reinforces that the work-availability requirement applies only to three of the six qualifying conditions, in that it only mentions the requirement in its discussion of some qualifying conditions.  *See* 85 Fed. Reg. 19329–30.  And, in any event, even if the preamble supported the agency's position, it could not countermand the unambiguous terms of the regulation itself.

of the Emergency Paid Sick Leave Act's six qualifying conditions.  Nothing in the Final Rule's

text or structure suggests the requirement applies outside of the three circumstances to which it is

explicitly attached.  And, as traditional tools of textual interpretation teach, the explicit recitation

of the requirement with respect to some qualifying circumstances suggests by negative

implication its inapplicability to the other three.  *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929,

940 (2017).  DOL has proffered no reason, apart from its statutory argument, that the regulation

should be interpreted to apply the requirement more broadly than the Final Rule's express terms

command.  Accordingly, the Court concludes that the work-availability requirement applies only

to three of the six qualifying conditions under the EPSLA, as well as family leave under the

EFMLEA.

The question remains, however, whether that regime exceeds the agency's authority

under the statute.  To answer that question, the Court must apply *Chevron*'s familiar two-step

framework.  *See Chevron U.S.A. Inc., v. Natural Resources Defense Council*, 467 U.S. 837

(1984).  Under *Chevron*, "if the statute is silent or ambiguous with respect to the specific issue,"

courts will defer to an agency's interpretation as long as it is reasonable.  467 U.S. at 843.  Thus,

at Chevron's first step, the Court must determine whether the statute is ambiguous.  *See Catskill

Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 507 (2d Cir.

2017).  If it is, the Court must proceed to step two and determine whether the agency's

interpretation of the ambiguous statute is reasonable.  *See id.*

The statute here grants paid leave to employees who, in the case of the EPSLA, are

"unable to work (or telework) due to a need for leave because" of any of the six qualifying

conditions or, in the case of the EFMLEA, are "unable to work (or telework) due to a need for

leave to care for" a child due to COVID-19.  *See* FFCRA §§ 5102(a), 110(a)(2)(A).  According

to DOL, those terms are unambiguous, such that the Court's need not advance to *Chevron*'s second step.  Specifically, DOL urges that the terms "due to" (as it appears in both provisions at issue) and "because" *compel* the conclusion that an employee whose employer "does not have work" for them is not entitled to leave irrespective of any qualifying condition.  The terms "due to" and "because," DOL argues, imply a but-for causal relationship.  If the employer lacks work for the employee, the employee's qualifying condition would not be a but-for cause of their inability to work, but rather merely one of multiple sufficient causes.  And, DOL adds, an absence from work due to a lack of work is not "leave."

DOL is correct, of course, that the traditional meaning of "because" (and "due to") implies a but-for causal relationship.  *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1739 (2020).  But to say that these terms usually connote but-for causation is not to say that they unambiguously do.  Nor does it necessarily follow that the baseline requirement of but-for causation cannot be supplemented with a special rule for the case of multiple sufficient causation.  *See Burrage v. United States*, 571 U.S. 204, 214 (2014) (acknowledging that but-for causation, in typical legal usage, is sometimes supplemented with a special rule for multiple sufficient causation).  Indeed, as the Supreme Court recently recognized in another statutory context interpreting the term "because,"

> Congress could have taken a more parsimonious approach.  As it has in other statutes, it could have added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law.  *Cf.* 11 U.S.C. § 525; 16 U.S.C. § 511.  Or it could have written "primarily because of" . . . .  *Cf.* 22 U.S.C. § 2688.  But none of this is the law we have.

*Bostock*, 140 S. Ct. 1731, 1739 (2020).  Here, the Court cannot conclude that the terms "because" or "due to" unambiguously foreclose an interpretation entitling employees whose

14

inability to work has multiple sufficient causes — some qualifying and some not — to paid leave.

Nor is the Court persuaded that the term "leave" requires that the inability to work be caused solely by a qualifying condition.  "Leave," DOL argues, connotes "authorized especially extended absence from duty or employment," or "time permitted away from work, esp[ecially] for a medical condition or illness or for some other purpose."  (*See* Dkt. No. 25 at 23 (first quoting Definition of Leave, Merriam-Webster, https://www.merriam-webster.com/dictionary/leave (last accessed Aug. 2, 2020), and then quoting Definition of Leave, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/leave (last accessed Aug. 2, 2020).)  But those definitions can accommodate New York's view as well as DOL's.  An employee may need leave (*i.e.*, an agreed-upon and permitted absence from work) tethered to one reason even if her employer has no present work for her due to some other reason.  For example, in ordinary usage, a teacher on paid parental leave may still be considered on "leave" even if school is called off for a snow day.

New York, for its part, argues that the statute unambiguously forecloses DOL's argument.  (*See* Dkt. No. 4 at 8–10.)  The statute, New York notes, both uses mandatory language to describe the obligation to provide paid leave and contains several express exceptions to that obligation, suggesting the absence of other implied limitations.  (*See* Dkt. No. 4 at 8.)  But those features of the statute are entirely consistent with DOL's interpretation.  The causation requirement in the Final Rule is not an additional, implicit exception, nor a negation of the mandatory nature of the leave obligations, but rather a limiter of the universe of individuals who qualify for the leave in the first instance.  The statutory regime cannot be implemented without ascribing *some* causal requirement to the causal language, and doing so is not tantamount to

adding an additional, exogenous criterion.  New York also perceives a conflict between requiring but-for causation and the broader remedial goals of the statute, given that the Final Rule would dramatically narrow the pool of employees entitled to leave as compared to New York's preferred interpretation.  (*See* Dkt. No. 4 at 10–11.)  But any such conflict is immaterial at *Chevron*'s first step, where the Court's charge is only to determine whether the statute's text is ambiguous.  And in any event, that Congress's aim in passing the statute was remedial does not require that every provision of the statute be read to unambiguously be given maximal remedial effect.  The statute, like virtually all statutes, reflects a balance struck by Congress between competing objectives.

The statute's text, the Court concludes, is ambiguous as to whether it requires but-for causation in all circumstances, or instead whether some other causal relationship — specifically, multiple sufficient causation — satisfies its eligibility criteria.  The Court must therefore proceed to *Chevron*'s second step.

At its second step, *Chevron* requires an inquiry into "whether the agency's answer [to the interpretive question] is based on a permissible construction."  *Catskill Mountains*, 846 F.3d at 520 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011)).  A reviewing court should not "disturb an agency rule at *Chevron* step two unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'"  *Id.*  Even under this deferential standard of review, interpretations "arrived at with no explanation," like interpretations "picked out of a hat," are unacceptable, even if they "might otherwise be deemed reasonable on some unstated ground."  *Catskill Mountains*, 846 F.3d at 520.

The Final Rule's work-availability requirement fails at *Chevron* step two, for two reasons.  First, as to the EPSLA, the Final Rule's differential treatment of the six qualifying

conditions is entirely unreasoned.  Nothing in the Final Rule explains this anomaly.  And that differential treatment is manifestly contrary to the statute's language, given that the six qualifying conditions share a single statutory umbrella provision containing the causal language.  *See* FFCRA § 5102(a).  Second, and more fundamentally, the agency's barebones explanation for the work-availability requirement is patently deficient.  The requirement, as an exercise of the agency's delegated authority, is an enormously consequential determination that may considerably narrow the statute's potential scope.  In support of that monumental policy decision, however, the Final Rule offers only *ipse dixit* stating that "but-for" causation is required.  *See, e.g.,* Final Rule at 19329 (reasoning that the work-availability requirement is justified "because the employee would be unable to work even if he or she" did not have a qualifying condition).  That terse, circular regurgitation of the requirement does not pass *Chevron*'s minimal requirement of reasoned decision-making.  The work-availability requirement therefore fails *Chevron*'s second step.

### C.      Definition of "Health Care Provider"

The State of New York next contends that the Final Rule's definition of a "health care provider" exceeds DOL's authority under the statute.  (*See* Dkt. No. 4 at 11–16.)  Because employers may elect to *exclude* "health care providers" from leave benefits, the breadth of the term "health care provider" has grave consequences for employees.

The FMLA, which supplies the relevant statutory definition for both provisions of the FFCRA at issue, defines a "health care provider" as: "(A) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or (B) any other person determined by the Secretary to be capable of providing health care services."  29 U.S.C. § 2611(6).  The Final Rule's definition is worth quoting at

length; invoking the Secretary's authority under subsection (B), it defines a "health care

provider" for the purposes of the FFCRA leave provisions as:

> anyone employed at any doctor's office, hospital, health care center,
> clinic, post-secondary educational institution offering health care
> instruction, medical school, local health department or agency,
> nursing facility, retirement facility, nursing home, home health care
> provider, any facility that performs laboratory or medical testing,
> pharmacy, or any similar institution, Employer, or entity.   This
> includes any permanent or temporary institution, facility, location,
> or site where medical services are provided that are similar to such
> institutions,

as well as

> any individual employed by an entity that contracts with any of these
> institutions described above to provide services or to maintain the
> operation of the facility where that individual's services support the
> operation of the facility, [and] anyone employed by any entity that
> provides medical services, produces medical products, or is
> otherwise involved in the making of COVID-19 related medical
> equipment, tests, drugs, vaccines, diagnostic vehicles, or treatments.

Final Rule at 19,351 (§ 826.25).   The definition, needless to say, is expansive:   DOL concedes

that an English professor, librarian, or cafeteria manager at a university with a medical school

would all be "health care providers" under the Rule.   (*See* Dkt. No. 25 at 29.)

Returning to *Chevron*'s first step, the Court concludes that the statute unambiguously

forecloses the Final Rule's definition.   The broad grant of authority to the Secretary is not

limitless.   The statute requires that the Secretary determine that the *employee* be capable of

furnishing healthcare services.   It is the "person" — *i.e.*, the employee — that the Secretary must

designate.   29 U.S.C. § 2611(6).   And the Secretary's determination must be that the person is

*capable of providing healthcare services*; not that their work is remotely related to someone

else's provision of healthcare services.   Of course, this limitation does not imply that the

Secretary's designation must be made on an individual-by-individual basis.   But the statutory

text requires at least a minimally role-specific determination.   DOL's definition, however, hinges

entirely on the identity of the *employer*, in that it applies to anyone employed at or by certain classes of employers, rather than the skills, role, duties, or capabilities of a class of employees.

DOL nonetheless urges that its definition is consistent with the context in which the term is used. The term "health care provider," as used in the FFCRA, serves to exempt employees who are essential to maintaining a functioning healthcare system during the pandemic. *See* Final Rule at 19,335. A broad definition of "health care provider" operationalizes that goal, because employees who do not directly provide healthcare services to patients — for example, lab technicians or hospital administrators — may nonetheless be essential to the functioning of the healthcare system. (*See* Dkt. No. 25 at 28.) But that rationale cannot supersede the statute's unambiguous terms. And, in any event, the Final Rule's definition is vastly overbroad even if one accepts the agency's purposivistic approach to interpretation, in that it includes employees whose roles bear *no nexus whatsoever* to the provision of healthcare services, except the identity of their employers, and who are not even arguably necessary or relevant to the healthcare system's vitality. Think, again, of the English professor, who no doubt would be surprised to find that as far as DOL is concerned, she is essential to the country's public-health response. The definition cannot stand.[8]

---

[8] New York levies an additional challenge against the definition of "health care provider." The Final Rule purports to define a "health care provider" solely for the purposes of the EFMLEA and EPSLA, while leaving in place the narrower definition in pre-existing regulations implementing the FMLA. The definition, New York claims, must track the definition ascribed to the same words elsewhere in the FMLA, because the same provision gives the definition of "health care provider" for both relevant sections the FFCRA and for the remainder of the FMLA. (*See* Dkt. No. 4 at 15–16.) But the Supreme Court has occasionally suggested that an agency may interpret a shared term differently across various sections of a statute, even if the statute provides a single statutory definition, as long as the different definitions individually are reasoned and do not exceed the agency's authority. *See, e.g., Barber v. Thomas*, 560 U.S. 474, 574–75 (2010); *but see id.* at 582–83 (Thomas, J., dissenting). Nonetheless, because the Court rejects the Final Rule's definition on other grounds, it has no occasion to consider whether the differentiation is permissible.

###### D.    Intermittent Leave

New York next argues that the regulation's prohibition on intermittent leave exceeds DOL's authority under the statute.  The Final Rule permits "employees to take Paid Sick Leave or Expanded Family and Medical Leave intermittently (*i.e.*, in separate periods of time, rather than one continuous period) only if the Employer and Employee agree," and, even then, only for a subset of the qualifying conditions.  *See* Final Rule at 19,353 (§§ 826.50(a)-(c)).  By constraining the exercise of intermittent leave to "circumstances where there is a minimal risk that the employee will spread COVID-19 to other employees," the Final Rule balances the statute's goals of employee welfare and public health.  *Id.* at 19,337.

The parties again disagree on the meaning of the regulations.  New York reads the regulations to require employees to take *any* qualifying leave in a single block, and that any leave not taken consecutively in a single block is thereafter forfeited.  (*See* Dkt. No. 4 at 17–20.) On this understanding, an employee who took two days off while seeking a COVID-19 diagnosis but thereafter returned to work could not take any additional EFMLEA leave, even if the employee later developed a different qualifying condition.  DOL responds that the regulations forbid intermittent leave only for any *single* qualifying reason.  (*See* Dkt. No. 25 at 30–31.) Thus, if the employee returns to work after taking two days of qualifying leave while seeking a diagnosis, the employee may later take more paid leave if she develops another qualifying condition.

This time, the language of the regulation favors DOL's view.  The Final Rule states that "[o]nce the Employee begins taking Paid Sick Leave for one or more of [the reasons for which intermittent leave is forbidden], the Employee must use the permitted days of leave consecutively until the Employee no longer has a qualifying reason to take Paid Sick Leave." Final Rule at 19,353.  That provision, however, says nothing about forfeiting *remaining* days of

leave after leave is taken intermittently.  The most natural reading of the provision, then, squares with the interpretation advanced by DOL:  An employee taking leave for an intermittent-leave-restricted reason must take his or her leave consecutively until his or her need for leave abates.  But once the need for leave abates, the employee retains any remaining paid leave, and may resume leave if and when another qualifying condition arises.  That understanding is also in harmony with the Rule's stated justification for the restriction, which, as discussed in more detail below, relates to the public-health risk of an employee who may be infected with COVID-19 returning to work before the risk of contagion dissipates.

Turning to the heart of New York's challenge, the Court concludes that the intermittent-leave constraints, as properly interpreted, are largely though not entirely consistent with the FFCRA.  Congress did not address intermittent leave at all in the FFCRA; it is therefore precisely the sort of statutory gap, under *Chevron* step one, that DOL's broad regulatory authority empowers it to fill.  FFCRA § 5111(3) (delegating the authority to the Secretary to promulgate regulations "as necessary, to carry out the purposes of this Act"); *see id.* § 3102(b), *amended by* CARES Act § 3611(7) (same).  Moreover, Congress knows how to address intermittent leave if it so desires; the FFCRA's silence contrasts with the presence of both affirmative grants and affirmative proscriptions on intermittent leave in the FMLA.  *See* 29 U.S.C. § 2612(b)(1).  Unlike in those instances, in the context of the FFCRA, Congress left this interstitial detail to the agency's expert decision-making.  And though New York points to several provisions in the FFCRA that would be nonsensical if leave could not be accrued incrementally (*see* Dkt. No. 4 at 18–20), those provisions cohere with the Final Rule's intermittent leave restrictions as properly interpreted, because the Final Rule as construed contemplates leave taken in multiple increments, as long as each increment is attributable to a

different instance of qualifying conditions. DOL's intermittent-leave rules are therefore entitled to deference if they are reasonable. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 168 (2d Cir. 2017).

The intermittent-leave provisions falter in part, however, at *Chevron*'s second step. Under the Final Rule, intermittent leave is allowed for only certain of the qualifying leave conditions, and, even then, only if the employer agrees to permit it. Final Rule at 19,353 (§§ 826.50(a)-(c)). The conditions for which intermittent leave is entirely barred are those which logically correlate with a higher risk of viral infection.[9] As explained in the Final Rule's preamble, this restriction advances Congress's public-health objectives by preventing employees who may be infected or contagious from returning intermittently to a worksite where they could transmit the virus. *See id.* at 19,337. Fair enough. But that justification, while sufficient to explain the Final Rule's *prohibitions* on intermittent leave for qualifying conditions that correspond with an increased risk of infection, utterly fails to explain why employer *consent* is required for the remaining qualifying conditions, which concededly do not implicate the same public-health considerations. For example, as the Final Rule explains, if an employee requires paid leave "solely to care for the employee's son or daughter whose school or place of care is closed," the "absence of confirmed or suspected COVID-19 in the employee's household reduces the risk that the employee will spread COVID-19 by reporting to the employer's

---

[9] These include leave because employees: are subject to government quarantine or isolation order related to COVID-19, have been advised by a healthcare provider to self-quarantine due to concerns related to COVID-19, are experiencing symptoms of COVID-19 and are taking leave to obtain a medical diagnosis, are taking care of an individual who either is subject to a quarantine or isolation order related to COVID-19 or has been advised by a healthcare provider to self-quarantine due to concerns related to COVID-19, or are experiencing any other substantially similar condition specified by the Secretary of Health and Human Services.

worksite while taking intermittent paid leave." Final Rule at 19,337. The Final Rule therefore acknowledges that the justification for the bar on intermittent leave for certain qualifying conditions is inapplicable to other qualifying conditions, but provides no other rationale for the blanket requirement of employer consent. Insofar as it requires employer consent for intermittent leave, then, the Rule is entirely unreasoned and fails at *Chevron* step two. It survives *Chevron* review insofar as it bans intermittent leave based on qualifying conditions that implicate an employee's risk of viral transmission.

### E.  Documentation Requirements

Finally, New York argues that the Final Rule's documentation requirements are inconsistent with the statute. (*See* Dkt. No. 4 at 21–23.) The Final Rule requires that employees submit to their employer, "prior to taking [FFCRA] leave," documentation indicating, *inter alia*, their reason for leave, the duration of the requested leave, and, when relevant, the authority for the isolation or quarantine order qualifying them for leave. *See* Final Rule at 19,355 (§ 826.100). But the FFCRA, as New York points out, contains a reticulated scheme governing prior notice. With respect to emergency paid family leave, the EFMLEA provides that, "[i]n any case where the necessity for [leave] is foreseeable, an employee shall provide the employer with such notice of leave as is practicable." FFCRA § 3102(b) (adding FMLA § 110(c)). And with respect to paid sick leave, the EPSLA provides that "[a]fter the first workday (or portion thereof) an employee receives paid sick time under this Act, an employer may require the employee to follow reasonable notice procedures in order to continue receiving such paid sick time." *Id.* § 5110(5)(E). To the extent that the Final Rule's documentation requirement imposes a different and more stringent precondition to leave, it is inconsistent with the statute's unambiguous notice provisions at fails at *Chevron* step one.

The federal government urges the Court to distinguish between the question of prior notice (which is what the statutory scheme addresses) and documentation requirements (which is what the regulation describes).  (*See* Dkt. No. 33–34.)  But a blanket (regulatory) requirement that an employee furnish documentation *before taking leave* renders the (statutory) notice exception for unforeseeable leave and the statutory one-day delay for paid sick leave notice completely nugatory.  Labels aside, the two measures are in unambiguous conflict.  The federal government also contends that the documentation requirements are not onerous (*see* Dkt. No. 34 at 25); be that as it may, the requirement is an unyielding condition precedent to the receipt of leave and, in that respect, is more onerous than the unambiguous statutory scheme Congress enacted.  The documentation requirements, to the extent they are a precondition to leave, cannot stand.

### F.       Severability

The APA requires courts to "hold unlawful and set aside agency action" that is not in accordance with law or in excess of statutory authority.  5 U.S.C. § 706(2).  "Agency action" may include "the whole or a part of an agency rule."  5 U.S.C. § 551(13).  "Thus, the APA permits a court to sever a rule by setting aside only the offending parts of the rule."  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  To that end, the "'invalid part' of a statute or regulation 'may be dropped if what is left is fully operative as a law,' absent evidence that 'the [agency] would not have enacted those provisions which are within its power, independently of that which is not.'"  *United States v. Smith*, 945 F.3d 729, 738 (2d Cir. 2019) (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)).

Here, New York contends that each offending portion of the Final Rule is severable from the remainder of the Final Rule.  (*See* Dkt. No. 4 at 23–25.)  DOL does not dispute the provisions' severability, and the Court sees no reason that the remainder of the Rule cannot

operate as promulgated in the absence of the invalid provisions.  The following portions, and only the following portions, of the Final Rule are therefore vacated: the work-availability requirement; the definition of "health care provider"; the requirement that an employee secure employer consent for intermittent leave; and the temporal aspect of the documentation requirement, that is, the requirement that the documentation be provided before taking leave. The remainder of the Final Rule, including the outright ban on intermittent leave for certain qualifying reasons and the substance of the documentation requirement, as distinguished from its temporal aspect, stand.

******

The Court acknowledges that DOL labored under considerable pressure in promulgating the Final Rule.  This extraordinary crisis has required public and private entities alike to act decisively and swiftly in the face of massive uncertainty, and often with grave consequence.  But as much as this moment calls for flexibility and ingenuity, it also calls for renewed attention to the guardrails of our government.  Here, DOL jumped the rail.

**G.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is DENIED.  Plaintiff's motion for summary judgment is GRANTED as to the work-availability requirement, the definition of "health care provider," and the temporal aspect of the documentation requirements, and is GRANTED in part and DENIED in part as to the intermittent-leave provision.  Defendants' motion for summary judgment is GRANTED in part as to the intermittent-leave prohibition, and is otherwise DENIED.

25

The Clerk of Court is directed to close the motions at Docket Numbers 3, 24, and 31.

SO ORDERED.

Dated: August 3, 2020
       New York, New York

_____
              J. PAUL OETKEN
        United States District Judge